UNITED STATES of America, Appellee,

v.

Joseph CUSIMANO; William Mylett;
Robert Allen; Thomas Flanagan
and Albert Brody, Defendants,

Robert Flanagan, Defendant–Appellant.

No. 1226, Docket 96–1527.

United States Court of Appeals,
Second Circuit

Argued Feb. 27, 1997.

Decided Aug. 18, 1997.

Guy Petrillo, Assistant United States Attorney for the Southern District of New York, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Reid M. Figel, Karen Patton Seymour, Assistant United States Attorneys for the Southern District of New York, of counsel), for Appellee.

David A. Lewis, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York City, for Appellant.

Before: VAN GRAAFEILAND, MESKILL, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Defendant–appellant Robert Flanagan appeals from his judgment of conviction and sentence filed on August 14, 1996, in the United States District Court for the Southern District of New York (John S. Martin, *Judge*). Flanagan's conviction stemmed from insider trading by Flanagan and his co-defendants in the common stock of Digital Microwave Corporation ("Digital Microwave"), and in options on the common stock of NCR Corporation ("NCR") and Teradata Corporation ("Teradata"). After a one-week jury trial, Flanagan was convicted of one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and two counts of securities fraud, in violation of § 10(b) of the Securities Exchange Act of 1934 ("§ 10(b)") [1] and the Securities and Exchange Commission's Rule 10b–5 ("Rule 10b–5") [2], 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R.

---

**1.** § 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility or any national securities exchange—To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**2.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances un-

§ 240.10b–5; 18 U.S.C. § 2.[3] The district court sentenced Flanagan to a term of imprisonment of 24 months, followed by three years of supervised release, and imposed a fine of $5,000 and special assessments.

Flanagan raises principally four arguments on appeal: (1) the "misappropriation theory" of liability under § 10(b) and Rule 10b–5, upon which his conviction was based, is invalid; (2) there was insufficient evidence to prove that the information possessed by Flanagan regarding Digital Microwave was material or non-public; (3) the district court erred by refusing to give a multiple conspiracy charge; and (4) Flanagan's sentence should be vacated because the court wrongly included the profits to his tippees in calculating Flanagan's trading gains, and refused to offset Flanagan's gains by his losses from trading Digital Microwave. We reject appellant's arguments and affirm for the reasons set forth below.

## I.

This case involves an insider-trading scheme based on the theft of non-public information from the American Telephone and Telegraph Company ("AT & T"). The information at issue, which was stolen by Charles Brumfield, then Vice President of Labor Relations at AT & T, concerned AT & T's proposed acquisitions of three publicly traded corporations—NCR, Digital Microwave, and Teradata. Brumfield disclosed information about the proposed acquisitions of these three companies to his subordinate and friend Thomas Alger, then a District Manager in AT & T's Labor Relations Department. Alger, in turn, passed the information to, among others, his friend Flanagan. Flanagan arranged for others to purchase securities on behalf of Alger, Brumfield, and himself, and on one occasion he personally purchased securities for himself through a corporate account.

## A. NCR

AT & T began to examine seriously the possibility of acquiring NCR in October 1990. Acquisition teams were assembled, and among them was one including William Ketchum, Brumfield's supervisor. On November 8, 1990, *The Wall Street Journal* reported rumors of a possible merger between AT & T and NCR. AT & T declined to comment on the rumors. Within a week, on November 14, AT & T's Board of Directors met and authorized the $7.5 billion acquisition of NCR. AT & T made public its interest in NCR on December 2, and instituted a tender offer for NCR shares at $90 per share on December 5.

Alger testified that Brumfield first told him of AT & T's interest in acquiring NCR in late 1988. Thereafter, he and Brumfield discussed the possibility of an acquisition of NCR by AT & T on numerous occasions through November 1990, and Alger attempted to profit on this information by trading in NCR options. Initially, Alger purchased the securities through his own account. Alger subsequently decided to try to conceal the trades by trading in other people's accounts not affiliated with AT & T. He therefore arranged for others, including Flanagan, to buy the NCR securities for him. Since the acquisition of NCR was not executed prior to November 1990, however, the options Alger purchased expired and, accordingly, he did not profit on his inside information based on his trades during that period.

At some point on either November 14, 15 or 16, 1990, Alger received a telephone call from Brumfield informing him that a takeover of NCR by AT & T was "a lock," "a

der which they were made, not misleading, or
(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**3.** Flanagan was acquitted on one count of fraud in connection with a tender offer in violation of § 14(e) of the Securities Exchange Act of 1934 ("§ 14(e)") and the Securities and Exchange Commission's Rule 14e–3 ("Rule 14e–3"), 15 U.S.C. §§ 78n(e) and 78ff; 17 C.F.R. § 240.14e–3(a). Co-defendants Joseph Cusimano, William Mylett, Robert Allen, Thomas Flanagan, and Albert Brody each pleaded guilty to the conspiracy charge. Cusimano appealed his sentence, and this Court affirmed. *United States v. Mylett*, 97 F.3d 663 (2d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2509, 138 L.Ed.2d 1013 (1997).

sure thing," and would be announced within the next few weeks. Alger understood that Brumfield obtained this information either through his supervisor, or through meetings having to do with the NCR acquisition. Brumfield asked Alger to buy NCR options on Brumfield's behalf, and Alger agreed. Alger testified that he then reported the information to Flanagan, that Flanagan agreed to purchase NCR options for Alger and Brumfield, and that Alger provided Flanagan with around $14,000 in cash with which to do so. Alger also testified that he tipped his friends Michael Sweeney, a Merrill Lynch trader, Albert Brody, and Jack O'Brien about the NCR acquisition, and that he arranged for Brody and O'Brien to purchase options for him. Although he was unsure whether he had told Flanagan that others were also trading for him, Alger testified that this trading was "not a secret."

Flanagan apparently responded to Alger's tip and his instructions regarding NCR by arranging for his brother (Thomas Flanagan), his girlfriend (Sharon Seiden), and his friend (William Corrigan) to purchase substantial quantities of NCR options on November 15. After the price of NCR stock skyrocketed following the December 2 announcement of the stock-for-stock offer and the December 5 announcement of the cash tender offer, the accounts of Thomas Flanagan, Seiden, and Corrigan yielded profits of $340,109, $352,687, and $134,377 respectively. According to Alger, Flanagan later paid Alger his share of the profits in three installments totaling $56,000.

### B. *Digital Microwave*

On March 20, 1991, AT & T's Board of Directors authorized the acquisition of Digital Microwave, a company with which AT & T had been engaged in joint development projects since 1989, for an amount not to exceed $325 million. On the same day, Brumfield entered Alger's office, closed the door, told him that "something was happening" between AT & T and Digital Microwave, although "he wasn't sure what," and told Alger that he should find out more about the company. Alger testified that he "was al-

most positively sure" that Brumfield had learned that "something was happening" involving Digital Microwave as a result of his position with AT & T, although he later testified that he was not certain of Brumfield's source.

Alger testified that he immediately called Sweeney and another friend, Larry Friedman, to get information about the company. After he reported what he had learned to Brumfield, Alger testified that he and Brumfield arranged for Alger to buy shares of Digital Microwave on Brumfield's behalf. Alger testified that he then contacted Flanagan, O'Brien, and Friedman, told them about the tip from Brumfield, and asked them to purchase shares for Alger in Digital Microwave. Flanagan made the purchases that Alger had requested, and additionally purchased almost $300,000 of Digital Microwave stock himself on March 28. Flanagan made these purchases through a corporate account that he opened for this purpose, as well as by arranging for his attorney and friend, John Lynch, to purchase stock through the account of Warren Smith, Lynch's law partner. Smith bought 27,500 shares of Digital Microwave's common stock, at a cost of approximately $445,000.

On March 29, 1991, AT & T called off the planned acquisition because Digital Microwave's stock price had risen enough to cause the cost of the acquisition to exceed the $325 million limit set by the Board at its March 20 meeting. The price of Digital Microwave stock on the next trading day, April 1, dropped significantly. Brumfield notified Alger on around April 1 that "nothing [was] going to happen" with Digital Microwave, and that the shares should be sold. Alger testified that he then called Flanagan, O'Brien, and Friedman and instructed them to sell the shares, which generated a modest profit when they were subsequently sold. Flanagan did not sell the shares that he had purchased on his own behalf until April 16, resulting in a loss of approximately $47,800.

### C. *Teradata*[4]

Following its merger with NCR, AT & T discovered that NCR was party to a joint

---

4. Although Flanagan was not charged independently with securities fraud based on the transac-

development agreement with Teradata that provided that the agreement would be invalidated in the event of a change of control of NCR. Accordingly, in order to gain exclusive rights to certain valuable technology possessed by Teradata, in October 1991, AT & T's Board of Directors authorized its Chairman and the President of NCR to begin discussions with Teradata about the possibility of acquiring Teradata. On November 27, 1991, the AT & T Board authorized the acquisition.

In mid-November 1991, Sweeney called Alger and told him that he had read a Dow Jones report stating that NCR had "extended a contract" with Teradata for thirty days, and that Alger should ask Brumfield if he knew anything about it. Alger did so, and on November 26 Brumfield called Alger, asked him to come down to his office, and told him that AT & T was going to acquire Teradata that weekend. Brumfield told Alger that this information was "not for publication" and to "really ... keep it quiet." Alger concluded that Brumfield had obtained the information based on his position with AT & T. Alger and Brumfield called Sweeney and asked him for price and volume information on Teradata. Sweeney informed them that Teradata was thinly traded and that they should trade lightly in it or risk investigation by the SEC. Brumfield asked Alger to buy Teradata options for him through Alger's contacts, and Alger called Brody, O'Brien, and Friedman to arrange it. During his conversation with Sweeney in Brumfield's office, Alger told Sweeney not to tell Flanagan about the acquisition, but to have Flanagan call Alger so that Alger could emphasize to Flanagan the importance of trading lightly. Alger testified that Flanagan called him later that day, that the two arranged to meet at a hotel lobby the following day, and that at that meeting he told Flanagan about the tip from Brumfield and asked him to trade for Brumfield.

On November 27, Brody, O'Brien, and Friedman purchased Teradata call options. Telephone records produced by the govern-

ment show that a thirty minute telephone conversation between Flanagan and Warren Smith took place the following day, November 28. The next morning, Smith invested more than $87,000 in Teradata call options.

On December 2, AT & T publicly announced that NCR had agreed to acquire Teradata for approximately $500 million. By the end of that day's trading, the price of Teradata common stock had risen over $5 per share. Within a few days, Smith sold the Teradata call options he had purchased, generating profits of approximately $80,000. Alger testified that the trades Flanagan had placed for Brumfield at Alger's request generated a profit of approximately $1,100.

## II.

### A. The Misappropriation Theory of Insider Trading

■ Flanagan's conviction for insider trading, both as a violation of § 10(b) and Rule 10b–5 and as an object of the conspiracy charge, was based on the so-called "misappropriation theory" of insider trading. In contrast to the traditional theory of insider trading, under which a corporate insider trades in the securities of his own corporation on the basis of material, non-public information, under the misappropriation theory § 10(b) and Rule 10b–5 are violated whenever a person trades while in knowing possession of material, non-public information that has been gained in violation of a fiduciary duty to its source. *See United States v. O'Hagan,* —— U.S. ——, ——, 117 S.Ct. 2199, 2202, 138 L.Ed.2d 724 (1997); *United States v. Mylett,* 97 F.3d 663, 666 (2d Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2509, 138 L.Ed.2d 1013 (1997). Despite our Circuit's long-standing acceptance of the misappropriation theory of insider trading liability, *see id.* at 667; *United States v. Libera,* 989 F.2d 596, 599–600 (2d Cir.), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993); *United States v. Chestman,* 947 F.2d 551, 566 (2d Cir.1991) (en banc), *cert. denied,* 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d

tions involving Teradata, these transactions formed part of the basis for the conspiracy charge.

422 (1992); *United States v. Carpenter*, 791 F.2d 1024, 1027–31 (2d Cir.1986), *aff'd by an equally divided court*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *United States v. Newman*, 664 F.2d 12, 17–18 (2d Cir.1981), Flanagan argues that we should reconsider its wisdom, citing two cases from other Circuits that held that the misappropriation theory does not support liability under § 10(b) and Rule 10b–5, *United States v. O'Hagan*, 92 F.3d 612 (8th Cir.1996), *rev'd*, — U.S. —, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *United States v. Bryan*, 58 F.3d 933 (4th Cir.1995). We can quickly dispose of Flanagan's argument. Subsequent to briefing and oral argument in this case, the Supreme Court reversed the Eighth Circuit's judgment in *O'Hagan* and endorsed the misappropriation theory of insider trading liability.[5] — U.S. —, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). Accordingly, we decline Flanagan's request that we revisit the issue.

B. *Sufficiency of the Evidence that Digital Microwave Tip Was Material and Non-Public*

■ Flanagan argues that his conviction on the count of insider trading that relates to Digital Microwave should be overturned because there was insufficient evidence that the information he possessed as to Digital Microwave was material or non-public. We disagree.

■ We note at the outset that in challenging the sufficiency of the evidence, appellant "bears a heavy burden. In reviewing such a challenge, we must view the evidence in the light most favorable to the government, crediting all inferences that could have been drawn in the government's favor." *United States v. Miller*, 116 F.3d 641, 676 (2d

Cir.1997) (internal quotation marks and citations omitted).

■ It is well settled that in order for information to be "material" for purposes of § 10(b) and Rule 10b–5, there must be a substantial likelihood that a reasonable investor would view it as significantly altering the "total mix" of information available. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 982–83, 99 L.Ed.2d 194 (1988); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). This inquiry is guided both by the probability that an event will occur and the anticipated magnitude of the event relative to the totality of the company's activity. *See Basic*, 485 U.S. at 238, 108 S.Ct. at 986. Viewing the evidence in the light most favorable to the Government, we conclude that the information regarding Digital Microwave was material. The fact that Brumfield, Alger, and Flanagan had already established a scheme to funnel reliable inside information out of AT & T based on Brumfield's position with the company—a scheme that had paid off handsomely in the case of NCR—contributed to the materiality of Brumfield's tip that "something was happening" between AT & T and Digital Microwave. Moreover, any expression of interest by the corporate giant AT & T would be an event of tremendous magnitude for Digital Microwave. Indeed it was enough to convince Flanagan—who admitted in his testimony before the SEC that Alger's tip contributed to his decision to purchase Digital Microwave stock—to invest almost $300,000 after borrowing around $280,-000 from family and friends. *Cf. SEC v. Geon Indus., Inc.*, 531 F.2d 39, 48 (2d Cir. 1976) (citing tippee's admission that tip was one reason for purchase of stock as support for finding of materiality). Under these circumstances, Flanagan has not met his "heavy

5. Based on his argument that the misappropriation theory should be rejected, Flanagan also argues that the conspiracy conviction should be dismissed since the only remaining basis for the jury's general verdict on the conspiracy count was a violation of Rule 14e–3 (governing trading on material, non-public information concerning a tender offer), which Flanagan argues exceeds the SEC's rulemaking authority. Although the jury acquitted Flanagan of the substantive Rule 14e–3 violation, the jury's general verdict on the

conspiracy count did not indicate whether it convicted him of conspiracy on this basis. Because Flanagan's violation of § 10(b) and Rule 10b–5 serves as a valid predicate for the conspiracy conviction, we need not address this claim. Nevertheless, we note that in *O'Hagan* the Supreme Court held, as this Court had held previously, *Chestman*, 947 F.2d at 563, that Rule 14e–3 was a valid exercise of the SEC's rulemaking authority. — U.S. at —, 117 S.Ct. at 2214.

burden" of persuading us to upset the jury's finding of materiality.

■ Neither has Flanagan met this burden with respect to the jury's finding that the information about Digital Microwave was non-public. Flanagan argues that the information conveyed to him should be deemed public because it was already fully "impounded" in the price of the stock. *See Libera,* 989 F.2d at 601. In support of his argument that the market had fully impounded the information about the potential acquisition of Digital Microwave by AT & T, Flanagan points to the fact that the stock price of Digital Microwave began to rise before Flanagan entered the market, and in fact had reached its height when Flanagan purchased shares. Flanagan offers no direct evidence, however, other than his own testimony that he had heard a rumor from Lynch, *cf. SEC v. Mayhew,* 121 F.3d 44, 49–50 (2d Cir.1997) (holding that tip from corporate insider which is more reliable or specific than public rumors is non-public despite existence of such rumors); *Mylett,* 97 F.3d at 666 (same), that information or rumors about the acquisition were circulating prior to Flanagan's entry into the market. Accordingly, we conclude that a reasonable jury could have found the information to have been non-public.

■ We also reject Flanagan's argument that his conviction for insider trading in Digital Microwave should be reversed because of the district court's refusal to charge the jury on the "impoundment" theory, or the theory that the market had already absorbed the information about Digital Microwave at the time Flanagan traded. Given the absence of direct evidence linking the price movements in Digital Microwave to rumors of the AT & T acquisition, the district court's finding that "the evidence is not sufficient . . . to support a charge of impoundment" should not be disturbed. In any case, Flanagan was not prejudiced by the district court's refusal to accept his proposed charge, inasmuch as the charge adequately conveyed to the jury that information that has become

public through rumors or other sources should not be considered non-public for purposes of § 10(b) and Rule 10b–5. *See United States v. Alkins,* 925 F.2d 541, 550 (2d Cir. 1991) ("A court has discretion to determine what language to use in instructing the jury as long as it adequately states the law.").[6]

## C. The District Court's Refusal to Issue a Multiple Conspiracy Charge

■ Flanagan argues that the district court's refusal to grant defense counsel's request for a multiple conspiracy charge requires that Flanagan be granted a new trial. In order to obtain a reversal on these grounds, a defendant must show "both that there was evidence of separate networks operating independently of each other and that he suffered substantial prejudice resulting from the failure to give the requested charge." *United States v. Maldonado–Rivera,* 922 F.2d 934, 962–63 (2d Cir.1990) (internal quotation marks omitted), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). We conclude that Flanagan has not suffered substantial prejudice, and we therefore reject appellant's claim without needing to reevaluate the evidence suggesting the existence of a single conspiracy linking Flanagan to O'Brien, Brody, and Friedman.

■ A showing of "substantial prejudice" requires the defendant to prove that the evidence in support of the conspiracy or conspiracies in which he did not participate prejudiced the case against him with respect to the conspiracy to which he was a party. *See United States v. Johansen,* 56 F.3d 347, 351 (2d Cir.1995). It is generally more difficult to make such a showing where, as here, the trial was a short trial involving a single defendant. *See United States v. Harris,* 8 F.3d 943, 947 (2d Cir.1993) ("The spill over effect is most pronounced when there is a lengthy trial of numerous defendants . . . [The defendant] was tried alone in a four day trial, which seriously undermines any possible claim of substantial prejudice."). More im-

---

**6.** The district court informed the jury that "[i]nformation is nonpublic if it is not available to the public through such sources as press releases, Securities and Exchange Commission filings, trade publications, analysts' reports, newspapers, magazines, rumors, word of mouth or other sources."

portantly, in the instant case the evidence introduced regarding trading by O'Brien, Brody, and Friedman involved substantially the same conduct as that proven against Flanagan, and therefore did not cause Flanagan to suffer substantial prejudice. *See United States v. Alessi*, 638 F.2d 466, 475 (2d Cir.1980) (refusing to find substantial prejudice based upon introduction of evidence of co-conspirators' conduct where the respective crimes "were not markedly different" and where "[t]he evidence against the various defendants was largely repetitive, describing transactions in which each defendant did essentially the same thing as his co-defendants had done"). Accordingly, we reject Flanagan's request for a new trial based on the district court's refusal to give a multiple conspiracy charge.

### D. *The Sentencing Calculation*

 Finally, Flanagan argues that his sentence should be vacated because the court erred in calculating his trading gains. The Sentencing Guidelines require that the base offense level for insider trading be adjusted upward, using the loss table in § 2F1.1, according to "the gain resulting from the offense." U.S.S.G. § 2F1.2. The Probation Department calculated the total gain in this case to be $946,574, including: the profit from trading in NCR (Thomas Flanagan—$340,109; Sharon Seiden—$352,687; William Corrigan—$134,377); the profit from trading in Digital Microwave (Warren Smith—$39,041); and the profit from trading in Teradata (Warren Smith—$80,360). In a letter submitted to the court prior to sentencing, Flan-

agan objected to the Probation Department's calculation, claiming that there was an insufficient factual basis for including the trading profits of Thomas Flanagan, Sharon Seiden, William Corrigan, and Warren Smith in "the gain resulting from the offense." Upon hearing argument on the issue, the district court offered to hold a hearing in which these other tippees could give sworn testimony, but defense counsel was content to rest on the testimony at trial. The court subsequently concluded that the Probation Department's calculation was appropriate, and that the preponderance of the evidence, *see United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir.1992), *cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993) ("disputed facts relevant to sentencing, even under the Guidelines, need be established only by a preponderance of the evidence"), proved that Flanagan should be held responsible for the gains by the other tippees.[7] Flanagan now renews his argument that the profits of Thomas Flanagan and William Corrigan cannot be attributed to him.[8] We disagree.

We will only overturn the district court's factual determination that, based on a preponderance of the evidence, Flanagan was "acting in concert with" or "provided inside information" to Corrigan and Thomas Flanagan if it is clearly erroneous, with due regard for the district court's prerogative to make credibility assessments and to choose between competing interpretations of the evidence. U.S.S.G. § 2F1.2, commentary (n. 1); *see, e.g., United States v. Ruggiero*, 100 F.3d 284, 291 (2d Cir.1996).

---

7. Accordingly, the court upwardly adjusted Flanagan's base offense level of eight, U.S.S.G. § 2F1.2(a), by eleven levels, to reflect that the gain from the offense was between $800,000 and $1,500,000, U.S.S.G. § 2F1.2(b)(1); U.S.S.G. § 2F1.1(b)(1)(L). It adjusted downward two levels based on its finding that Flanagan played a minor role in the offense, U.S.S.G. § 3B1.2(b), with a resulting offense level of seventeen, which in the applicable Criminal History Category of I called for a sentence of 24 to 30 months, U.S.S.G. Ch. 5, Pt. A. The court then imposed the minimum term of imprisonment of 24 months.

Flanagan argues, as he did in his pre-sentencing letter to the district court, that in calculating his "gain" the court should have deducted his

$47,804 loss from trading in Digital Microwave. The district court, while expressing skepticism about the propriety of netting gains against losses for the purpose of calculating defendant's "gain resulting from the offense" under U.S.S.G. § 2F1.2, found it unnecessary to resolve the issue since deducting this amount would not affect Flanagan's offense level. Deducting $47,804 from Flanagan's gain of $946,574 would still yield an upward adjustment of eleven levels, since the total amount exceeds $800,000. For this reason, we likewise find it unnecessary to address appellant's argument regarding the offsetting of losses.

8. Flanagan does not renew his argument with respect to the profits of Seiden and Smith.

The district court's determination that the trading profits of Corrigan and Thomas Flanagan should be attributed to appellant was not clearly erroneous. After Flanagan agreed to buy NCR options at Alger's request, he did not make any purchases in his own name, yet swiftly thereafter his brother Thomas Flanagan, his close friend Corrigan, and his girlfriend Seiden each traded heavily in NCR in accounts held at the same brokerage firm. Corrigan opened his account the very day that he purchased the NCR call options. Further evidence that Flanagan was "acting in concert" with his brother was Alger's testimony that on one of his trips to the restaurant owned by the Flanagans to pick up his trading profits, Flanagan had directed him to the back of the restaurant to pick up the money from his brother. In light of all this, we cannot say that the district court clearly erred in finding it likely that Flanagan provided information to Corrigan and his brother or acted in concert with them.

### III.

For the reasons stated above, we reject each of the defendant's arguments and affirm his conviction and sentence.