**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Alejandro Duclaud GONZALEZ DE CASTILLA, Jose Antonio Duclaud Gonzalez de Castilla, Pablo Velazquez Baranda, Maricruz Lozano Ledzma, Rodrigo Igartua Baranda, Elvira Baranda Garcia, Ana Igartua Baranda de Duclaud, Martha Baranda de Igartua, Anushka Trust, Caribbean Legal Trust, Antares Holdings Investment Ltd., and Banrise Ltd., BVI, Defendants.**

**No. 01 Civ. 3999(RWS).**

United States District Court,
S.D. New York.

June 27, 2001.

Securities and Exchange Commission by Mark Kreitman, Kevin O'Rourke, William R. Baker, III, Lawrence A. West, Neil J. Welch, Jr., Jose M. Rodriguez, Washington, DC, for Plaintiff.

Cravath, Swaine & Moore by John E. Beerbower, New York City, for Defendant Alejandro Duclaud Gonzalez de Castilla.

Gleason Koatz & Dyer by John P. Gleason, New York City, for Defendant Jose Antonio Duclaud.

Hogan & Hartson by Ira M. Feinberg, Lyndon M. Tretter, New York City, for Defendants Pablo Velazquez Baranda, Elvira Baranda Garcia, and Maricruz Lozano Ledezma.

Squadron Ellenoff Plesent & Sheinfeld by Ira Lee Sorkin, New York City, for Defendant Rodrigo Igartua Baranda.

Milbank, Tweed, Hadley & McCloy by Andrew E. Tomback, Matthew M. Oliver, Jennifer M. Anglim, New York City, for Non–Party Ignacio Guerrero Beneficiary of Banrise Ltd. BVI.

## OPINION

SWEET, District Judge.

In this action, plaintiff Securities and Exchange Commission ("SEC") alleges that defendant Alejandro Duclaud Gonzalez de Castilla ("A.Duclaud"), received and passed to various friends and relatives in

Mexico inside information pertaining to a January 2000 tender offer for CompUSA, Inc. ("CompUSA") that collectively yielded them millions of dollars.

After obtaining an ex parte temporary restraining order freezing the assets in brokerage accounts held by the individual defendants, an order for sworn accounting from each defendant and expedited discovery on May 10, 2001, the SEC has now moved (1) for a preliminary injunction enjoining the defendants from committing future violations of the federal securities laws; and (2) to continue the asset freeze until trial. Defendants A. Duclaud, Jose Antonio Duclaud Gonzalez de Castilla, ("J.Duclaud"), Pablo Velazquez Baranda ("Velazquez"), Maricruz Lozano Ledezma ("Lozano"),[1] Elvira Baranda Garcia ("E.Baranda"), Rodrigo Igartua Baranda ("R.Igartua"), non-party witness Ignacio Guerrero ("Guerrero"),[2] and his company, defendant Banrise Ltd. BVI ("Banrise"), opposed the motion.

For the reasons set forth below, the motion to continue the temporary restraining order freezing the defendants' assets and accounts, as modified in open court on June 8, 2001, is granted in part. The freeze shall continue through the trial, or until the resolution of this action by agreement of the parties, against all defendants except Pablo Velazquez, Maricruz Lozano Ledezma, and Elvira Baranda Garcia, for whom it shall be lifted. The motion for a preliminary injunction restraining future violations of the securities laws is denied as to all defendants.

### The Parties

Plaintiff Securities and Exchange Commission ("SEC") is a governmental agency charged with the task of ensuring compliance with federal securities laws.

Defendant Alejandro Duclaud is a Mexican citizen and resident married to defendant Ana Igartua Baranda de Duclaud ("A.Igartua"). At all times relevant to this action, he was a partner in the Mexico City law firm of Franck, Galicia, Duclaud and Robles, S.C. ("Franck, Galicia"). Franck, Galicia represents prominent Latin American investor, Carlos Slim Helu ("Slim"), and his companies, including Grupo Sanborns, which acquired CompUSA in a tender offer publicly announced on January 24, 2000. As a member of the Regulations Committee of the Mexican stock exchange since 1996, Duclaud participated in the drafting and enactment of regulations for the exchange, including those relating to insider trading. Alejandro Duclaud has resigned from Franck, Galicia and had his name removed from their firm name on May 21, 2001. He resigned his position at the Mexican stock exchange Regulations Committee on May 25, 2001, and is currently unemployed.

Alejandro Duclaud is the settlor, or creator, of nominal defendant Anushka Trust. The Anushka Trust is governed by English law and beneficially owns all the stock of Anushka Holdings, Ltd. The Anushka Trust makes equity investments through an account at PaineWebber, Inc. ("PaineWebber"), including the CompUSA trades at issue in this action.

Defendant Jose Antonio Duclaud, like his brother, Alejandro Duclaud, is a Mexican citizen and resident who practices law. Jose Antonio Duclaud's law offices are located in Cancún.

---

1. The complaint erroneously names Lozano as "Ledzma" rather than "Ledezma."

2. Although Guerrero has been implicated by these allegations and is the sole owner of defendant Banrise, the SEC has not named him as a defendant to date. With leave of the Court, counsel has appeared and filed opposition papers on behalf of both Banrise and Mr. Guerrero.

Jose Antonio Duclaud is the settlor, or creator, of nominal defendant Caribbean Legal Trust, which beneficially owns all the stock in Caribbean Legal Holdings, Ltd. ("Caribbean Legal Holdings"). The Carribean Legal Trust makes equity investments through an account at Paine-Webber, including the CompUSA trades at issue in this case.

Defendant Pablo Velazquez Baranda is a Mexican citizen and resident. His cousin is married to Alejandro Duclaud. Velazquez traded CompUSA stock through an account at Lehman Brothers, which he held in his own name jointly with his wife, defendant Maricruz Lozano Ledzma, and his mother, defendant Elvira Baranda Garcia.

Defendant Rodrigo Igartua Baranda, a Mexican citizen and resident, is a professional financial advisor who acts as the Chairman and Chief Executive Officer of SB Asesores S.A. de C.V. ("S.B.Asesores"), and is the president of defendant Antares Holdings Investment, Ltd. ("Antares"), an off-shore company established in order to facilitate his investments. Rodrigo Igartua Baranda is a cousin of defendant Pablo Velazquez Baranda, and is Alejandro Duclaud's brother-in-law. Both Alejandro and Jose Antonio Duclaud are Igartua's clients, and Alejandro and Rodrigo are involved in a real estate project together in Acapulco. Three of Igartua's brokerage accounts have been frozen in this action, including a personal account held at Lehman Brothers, the Antares PaineWebber account, and a PaineWebber account held jointly with his mother, defendant Martha Baranda de Igartua ("M.Baranda"), and his sister, defendant Ana Igartua Baranda de Duclaud ("A.Igartua").

Non-party witness Ignacio Guerrero is an Executive Director of Banco Internacionale ("BITAL"), one of the largest banks in Mexico. He is also the beneficial owner of defendant Banrise Limited BVI, an entity formed under the laws of Ireland in the mid–1990's, and reorganized under the law of the British Virgin Islands in the summer of 1999, which trades through Beta Capital Management, L.P. ("Beta Capital"), in Miami, Florida. Guerrero is a long-time friend of Alejandro Duclaud and Rodrigo Igartua.

### Findings of Fact

The facts presented by the parties are set forth in the complaint, affidavits of the parties, and discovery materials disclosed thus far. The amount of shares traded, amount per share, dates of trades, and profits are undisputed.[3] However, the SEC, relying on the theory that an unlawful tip from Alejandro Duclaud regarding Grupo Sanborn's impending tender offer for CompUSA prompted the defendants' purchases of CompUSA stock, has contested the defendants' assertions that their lucrative trades were solely the result of their own research, financial advisors' recommendations, and good fortune. The following constitute the Court's factual findings.

On September 10, 1999, Carlos Slim Helo filed a Schedule 13G indicating that he, his family, and their affiliated entities [4] had acquired 14.1% of the outstanding shares of stock in CompUSA. (Compl. ¶ 4; Beerbower Aff. Ex. P.) Rafael Robles Miaja ("Robles") of Franck, Galicia was listed on the cover sheet as Slim's attorney. Ro-

---

3. In a letter sent on May 29, 2001, the SEC corrected an error in ¶ 38 of the Complaint to reflect Alejandro Duclaud's true profit from the January 26, 2000 sale of CompUSA stock by Anushka Trust.

4. Hereinafter referred to collectively as "Slim," for ease of reference.

bles has testified by deposition that his only knowledge of Grupo Sanborns's interest in CompUSA was gained from reviewing the 13G before it was filed. On the day the Schedule 13–G was filed, CompUSA stock closed at approximately $7 per share. (Compl.¶ 14.)

Slim, a billionaire Mexican businessman whose companies account for almost half of Mexico's stock index, has received international attention as a "shrewd bargain hunter" (Beerbower Aff. Ex. G) with a reputation for "snapping up distressed companies at discount prices" (Beerbower Aff. Ex. H), and earning astronomical profits. The phenomenon of investors "following" Slim was well established in Mexico by 1999. (*See, e.g.,* Tomback Decl. Ex. Q (Michael S. Serrill, Mexican Prodigy, Time International, June 3, 1996).) [5]

Ignacio Guerrero and his business partner, non-party Gustavo Ortega ("Ortega"), aver that Slim's 13G filing prompted them to begin reviewing analyst reports, news reports, and other financial information concerning the desirability of selecting CompUSA as an investment vehicle for themselves and for their clients. (Ortega Decl. ¶¶ 2,3; Guerrero Tr. 170:16–21, 171:14–172:21, 173:21–174:23.) [6]

In the next two months, executives from Grupo Sanborns and CompUSA met several times in Mexico City and in Dallas, Texas to discuss Grupo Sanborns's interest in CompUSA and the possibility of establishing commercial arrangements between the two companies and their affiliates. (Compl.¶¶ 15–17.)

Slim filed a Schedule 13D on November 22, 1999, reflecting that he had increased his ownership of CompUSA to 14.8%, and notifying the public of the possibility that he might consider participating in transactions affecting the control of CompUSA. (Compl. ¶ 22; Beerbower Aff. Ex. O at 7 ("Item 4").) Again, Robles was listed as the Franck, Galicia attorney for Grupo Sanborns, but testified that his only involvement was to review the 13D before it was filed. CompUSA stock closed the day at $5.875 per share. (Compl.¶ 22). The press reacted positively about the outlook for CompUSA in light of Slim's increasingly serious interest in it. (*See, e.g.* Tomback Decl. Ex. S (Bloomberg, Mexico's Sanborns Boosts CompUSA Stake to 14.8%, May Buy More, Nov. 23, 1999).)

Meanwhile, Guerrero had success in another "follow Slim" investment venture. Guerrero had purchased shares in Prodigy after Slim took the company public in early 1999, and then sold for a $600,000 profit after the company announced plans for a partial acquisition in November of 1999. (Guerrero Tr. 98:20–99:24.)

After Slim's 13D filing, Grupo Sanborns representatives contacted CompUSA representatives by telephone to discuss Grupo Sanborns's interest in acquiring CompUSA. (Compl.¶ 23, 24.) Grupo Sanborns increased its valuation of CompUSA from $7.00, to $7.50, to $8.00 per share in the

---

**5.** Alejandro Duclaud's record of investing reflects that he, too has adopted the "follow Slim" approach to investing. (Duclaud Decl. ¶ 20.) His investments in Slim-related or Slim-controlled companies such as OfficeMax, Telmex, America Movil, Grupo Televisa and Grupo Sanborns, comprise 99% of the market value of the equity portion of his portfolio. (*Id.*)

**6.** One Bloomberg report issued on November 5, 1999 that Guerrero consulted noted significant strategic and financial improvements in CompUSA, and opined that "[w]hile not for the faint of heart or those who panic over short-term price swings, we think investors that buy CompUSA now will be substantially rewarded over the next 12 months. Consequently, we are upgrading to a Buy." (Tomback Decl. Ex. P. (Rebecca A. Yarchover, Piper Jaffray Report Re: CompUSA, Inc.).)

ensuing weeks, which CompUSA President and Chief Executive Officer James F. Halpin ("Halpin") rejected as inadequate. (Compl.¶¶ 23, 24.) Executives from both companies met again in Dallas on December 16, 1999 but could not reach agreement, and continued confidential discussions during the week of January 3, 2000. (Compl.¶¶ 25, 26.)

Ignacio Guerrero met with his friend Rodrigo Igartua on January 5, 2000 to discuss the possibility of Guerrero becoming involved in a real estate venture in Acapulco that Igartua had been pursuing with Alejandro Duclaud. (Tomback Decl. Ex. T (Guerrero Tr. 152:5–17; Igartua Tr. 177:21–179:5).) According to both men, the subject of CompUSA arose in connection with Carlos Slim's recent 13D filing. (Igartua Tr. 153:14–25, 161:18–163:8.) Guerrero agreed with Igartua's assessment that CompUSA looked like a good investment, particularly given Slim's involvement. (Guerrero Tr. 90:8–90:19; Igartua Tr. 177:21–178:7.)

On January 6, 2000, Igartua's Antares bought 14,300 shares of CompUSA stock at $5.125 per share, for a total cost of $73,864, and 10,700 shares at $5.1875 per share, for a total of $55,934. The same day, Guerrero's Banrise bought 300,000 CompUSA shares at $5.2127 per share for a total cost of $1,563,817.00, through its account at Beta Capital Management, which clears its trades through Bear Stearns. The purchase of 325,000 shares

by Igartua and Guerrero through their corporate entities [7] accounted for 27% of the 1,192,000 total volume of CompUSA shares sold that day. (Compl.¶¶ 26, 34, 35.)

The next day, Igartua's Antares bought an additional 30,000 shares at $5.0625 per share, for a total cost of $153,079.00. (Compl.¶ 34.)

During the week of January 10, 2000, Grupo Sanborns increased its tentative valuation of CompUSA to $9.00 per share in discussions with CompUSA executives. (Compl.¶ 27.) CompUSA retained Credit Suisse First Boston and authorized it to negotiate with Grupo Sanborns about their proposed valuation. (Compl.¶ 28, 29.)

During this same period, Igartua again spoke to Guerrero about CompUSA. (Igartua Tr. at 187–88).

Although Slim's Schedule 13 filings had prompted rumors of a takeover during the prior months, the likelihood of a Grupo Sanborns tender offer for CompUSA was inadvertently made public on January 18, 2000, when CompUSA CEO Halpin was asked about the possible deal during his testimony in a Dallas County, Texas courtroom. COC Services, Inc. ("COC"), had filed suit against CompUSA, Halpin, and Slim, alleging that Slim used COC to gain information about CompUSA and then used it, in collusion with Halpin, to acquire CompUSA and deprive COC of its prospective contractual right to open CompU-

---

**7.** The SEC notes that Antares, Banrise, A. Duclaud's Anushka Trust, and J. Duclaud's Caribbean Legal Trust were all "complex and anonymous overseas trust structures" (SEC Reply Br. at 1), and as such are evidence of misconduct. However, each of these entities was established months, if not years, before the CompUSA trades, see supra, and each defendant has testified that he established his account on a financial adviser's recommendation in order to be able to make investments without fear of subjecting himself to theft or

kidnaping, phenomena that are well-documented hazards for the wealthy in Mexico. (Igartua Tr. at 112; Tomback Decl. Ex. E (Guerrero Tr. 26:9–23); A. Duclaud Tr. 99:12–17; Tomback Decl. Ex. F (J. Duclaud Tr. 6:12–8:19); Tomback Decl. Exs. G, H, and I; Beerbower Aff. Ex. F.) In any case, each defendant's name was documented as the settlor of his respective corporate entity or trust on the documents establishing the trusts, and as such was available to the SEC during its investigation.

SA stores in Mexico; COC also sought a preliminary injunction barring CompUSA from doing business in Mexico. *See, e.g.,* Michael Burger, COC Services v. CompUSA, et al., The American Lawyer, Vol. XXII, No. 4 (April 2000). When asked on cross examination whether he was aware that Carlos Slim was planning to acquire CompUSA, Halpin testified:

> I can't comment on that. Can I talk to Your Honor for a second? ... There is a certain disclosure that I can't do as CEO of a public company in an open forum. I would be happy to talk to the attorneys and the Judge in private, but I can't—I can't violate my fiduciary responsibility to CompUSA.

(Beerbower Supp. Ex. 13 at 182–83 (*COC Services, Ltd. v. CompUSA, Inc.,* No. 00–00023–b, Jan. 18, 2000).) An off-the-record conversation ensued. (Id. at 183–84.)

Back in the confidential negotiations, by January 19, 2000, Grupo Sanborns had indicated its willingness to value CompUSA at $10.10 per share, a proposal that Credit Suisse agreed to share with the CompUSA board. (Compl.¶ 30.) That day, Igartua's Antares bought 20,000 shares of CompUSA stock at $5.375 per share, for a total cost of $108,504. Guerrero's Banrise bought 193,200 shares at $5.5625 per share for a total cost of $1,053,214.00. After discussing prospects for CompUSA with Igartua and Alejandro Duclaud, Jose Antonio Duclaud authorized Igartua to purchase 50,000 shares of CompUSA stock at $5.4375 per share through the PaineWebber account of Caribbean Legal Trust, for a total cost of $271,875. (Beerbower Aff. Exs. Q at 197–76, R at 146–48, 156–59.) Finally, Rodrigo Igartua bought 10,000 shares of CompUSA common stock through his Lehman Brothers

account at $5.50 per share, for a total cost of $55,164. (Compl.¶¶ 34, 35, 36, 37.)

Collectively, the defendants' purchase of 273,000 shares accounted for approximately 25% of the total volume of CompUSA shares (1,102,000) traded on January 19, 2000. (Compl.¶ 30.)

Although Alejandro Duclaud had authorized Rodrigo Igartua to purchase 180,000 CompUSA shares for him on January 19, 2000 through the Anushka Holdings account at PaineWebber, the trade was not executed until the next day.[8] Specifically, Anushka Trust bought 50,000 shares at $5.50 per share, for a cost of $275,000, 26,100 shares at $5.875 per share for a cost of $153,337, and 38,100 shares at $5.5625 per share for a cost of $211,931. (Compl.¶ 34, 38.) In order to satisfy Duclaud's total order, Igartua allocated to Duclaud 30,000 shares Igartua had previously purchased through Antares on January 7, 2000. (Duclaud Decl. ¶¶ 9, 10.) In addition, Igartua executed a purchase of 20,000 CompUSA shares at $5.5625 per share, or $112,154, through the PaineWebber account he held jointly with Ana, his sister, and Martha Baranda, his mother.

On the morning of January 20, 2000, Alejandro Duclaud and his wife Ana left Mexico city for a planned long weekend in New York with another couple. (Duclaud Decl.¶ 10.) That afternoon, a representative of Grupo Sanborns contacted Robles, informed him for the first time that the company's New York counsel, Cleary, Gottlieb, Steen & Hamilton ("Cleary, Gottlieb") had prepared a draft acquisition agreement with CompUSA, and asked him to fly to New York to work on the proposed transaction. (Compl. ¶ 31; Tomback Decl. Ex. W at AD 10254; A. Duclaud Br. at 7 n. 5.)

---

8. Igartua has testified that he does not recall having any conversations with Alejandro Duclaud prior to January 19, 2000. (Igartua Tr. at 144–45.)

The volume of CompUSA traded on January 20, 2000 rose to 2,584,200—only 134,200 of which was attributable to the defendants—more than doubling the previous day's volume. (Compl. ¶ 31.)

On Friday, January 21, 2000, Velazquez engaged in his first and only trade in CompUSA stock, purchasing 30,000 shares at $6.208 per share, for a total cost of $187,182, through the Lehman Brothers account that he shared with Elvira Baranda and Maricruz Lozano. The same day, Grupo Sanborns submitted a proposed merger agreement to CompUSA during a meeting in New York.

The price of CompUSA stock at the close of business on January 21, 2000 was $6.75 per share. The total trading volume doubled yet again from the previous day, with 5,778,000 shares changing hands, only 31,000 of which were attributable to the defendants. (Compl. ¶ 32.)

Grupo Sanborns and CompUSA issued a joint press release before trading opened on the New York Stock Exchange on Monday, January 24, 2000, announcing the execution of the merger agreement at a valuation of $10.10 per share for CompUSA stock. Rodrigo Igartua sold 10,000 CompUSA shares later that day, at $9.625 per share, for proceeds of $95,948, and a profit of $40,784. Velazquez also sold his 30,000 shares at the same price, for proceeds of $287,297 and profits of $100,115. CompUSA shares closed the day at $9.50 per share, on a volume of 24,615,200 shares traded.

Each of the defendants still holding CompUSA stock sold all their remaining shares at $9.625 per share on January 26, 2001, yielding significant profits. Igartua's Antares sold 75,000 shares for proceeds of $719,596 and profits of $328,215. (Compl. ¶ 34.) Guerrero's Banrise sold all 493,200 shares for proceeds of $4,727,160 and profits of $2,088,675. (Compl. ¶ 35.)

Jose Antonio Duclaud's Caribbean Trust sold all of its 50,000 shares for proceeds of $481,250 and profits of $209,375. (Compl. ¶ 36.) Alejandro Duclaud's Anushka Trust sold its 150,000 shares for proceeds of $1,925,000 and profits of $584,202. (Compl. ¶ 38 (as amended by SEC letter of May 29, 2001).) Igartua sold the 20,000 shares of CompUSA stock in his joint PaineWebber account for proceeds of $191,889 and profits of $79,735. (Compl. ¶ 39.)

The SEC began investigating in February 2000. After establishing the individuals associated with the corporate defendant entities that made the CompUSA trades, the SEC on May 7, 2001 requested that the brokerage firms prevent the defendants from transferring any funds out of their accounts. (SEC Reply Br. at 7.) The firms did so, without notifying the account holders. (*E.g.*, Beerbower Aff. Ex. K; Beerbower Supp. Ex. 7 at SEC 006446.)

On May 8, 2001, Igartua arranged to transfer $60,000 from his Lehman Brothers account in Miami, but was unable to do so, because, as he learned, there was a legal restriction on the account. He then attempted to transfer $400,000 from his joint Lehman Brothers account with Martha Baranda and Ana Igartua, which was also unsuccessful.

On May 9, 2001, the SEC contacted Alejandro Duclaud for the first time to ask him questions about the defendants' CompUSA trades and to seek his acquiescence to a freeze of his brokerage accounts, which had already in effect been frozen by PaineWebber at the SEC's request. The SEC was not able to contact any of the other defendants on either May 9 or May 10, 2001 before electing to file the complaint on May 10, 2001, along with an ex parte motion for a temporary restraining

order freezing the defendants' assets; an order to show cause why a preliminary injunction should not be entered; a motion for a sworn accounting from each defendant; a motion for expedited discovery; a motion for an order authorizing alternative means of service of process; and a motion for an "innocuous" order preventing the destruction of documents. (SEC Br. at 15.) The same day, Ignacio Guerrero authorized his Beta Capital broker to transfer one million pesos from his Miami Beta Capital account to his bank in Mexico. Jose Antonio Duclaud sought to transfer assets from his Caribbean Trust to a newly formed Chimpita Trust, but could not do so as a result of the freeze.

After notice to Alejandro Duclaud, the Court issued an order freezing the defendants' assets at approximately 5 p.m. on May 10, 2001, and a preliminary injunction hearing scheduled, the SEC issued a press release naming the defendants and setting forth its allegations of insider trading and the amounts of money they earned from the CompUSA trades. (Tomback Decl. Ex. A.) The SEC's action and the defendants' roles in the alleged scheme were widely reported, both in the United States and Mexico. (Beerbower Aff. Ex. E.)

Since May 10, 2001, the defendants have provided thousands of pages of documents and nine days of deposition testimony to the SEC.

The preliminary injunction motion was deemed fully submitted after oral argument was heard on June 8, 2001. Alejan-dro Duclaud, Jose Antonio Duclaud, Rodrigo Igartua, and Pablo Velazquez were each present in court, but were not called to testify. At the conclusion of the hearing, with the consent of the SEC, the Court modified the terms of the restraint on Velazquez's account to freeze only four times the funds earned from his CompU-SA trade, the minimum amount necessary to satisfy any eventual penalty against him. In addition, due cause having been shown, the Court ordered the freeze on all of the accounts to continue until this opinion was issued.

## I. Relevant Provisions of the Securities Exchange Act of 1934

The complaint alleges that Alejandro Duclaud acquired inside information in connection with his law firm's representation of Grupo Sanborns, traded on it, and passed it on to, or "tipped," the other defendants, who in turn traded on the information, in violation of to §§ 10(b) and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78n(e), and Rules 10b-5 [9] and 14e-3 promulgated thereunder, 17 C.F.R. §§ 240.10b-5 and 240.14e-3.

### A. Section 10(b) and Rule 10b-5

Section 10(b) and Rule 10b-5 prohibit any person from employing any device, scheme or artifice to defraud, making misrepresentations or misleading omissions, and engaging in any transaction, practice or course of business which operates as a

---

9. Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5 (1990).

fraud, in connection with the purchase or sale of securities.

### 1. Elements of Liability

■ A person is liable under § 10(b) and Rule 10b–5 when he obtains (a) material, (b) nonpublic information intended to be used solely for a proper purpose and then (c) misappropriates or otherwise misuses that information (d) with scienter, (e) in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits." *Dirks v. SEC,* 463 U.S. 646, 654, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *United States v. Newman,* 664 F.2d 12 (2d Cir.1981).

### a. Materiality

Information is material for the purposes of Section 10(b) and Rule 10b–5 if there is "a substantial likelihood that a reasonable investor would view it as significantly altering the 'total mix' of information available." *United States v. Cusimano,* 123 F.3d 83, 88 (2d Cir.1997), (*citing Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

The Second Circuit has repeatedly held that specific information pertaining to a proposed corporate acquisition, tender offer, or merger is quintessentially material. *See, e.g., S.E.C. v. Warde,* 151 F.3d 42, 47 (2d Cir.1998); *SEC v. Geon Indus., Inc.,* 531 F.2d 39, 47–48 (2d Cir.1976); *SEC v. Shapiro,* 494 F.2d 1301, 1307 (2d Cir.1974). However, the materiality of information regarding such a corporate event depends "upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988) (citation and internal quotation marks omitted).

### b. Nonpublic

■ Information remains "nonpublic" until it either (1) has been disclosed "to achieve broad dissemination to the investing public generally and without favoring any special person or group," *SEC v. Mayhew,* 121 F.3d 44, 50 (2d Cir.1997) (*quoting Dirks,* 463 U.S. at 653, 103 S.Ct. 3255), or (2) is known only by a few persons, but their trading on it "has caused the information to be fully impounded into the price of the particular stock," *Mayhew,* 121 F.3d at 50 (*quoting United States v. Libera,* 989 F.2d 596, 601 (2d Cir.1993)).

Evidence of widespread speculation or rumors of impending corporate actions weighs against a finding that the information is nonpublic. *See U.S. v. Cusimano,* 123 F.3d 83, 89 & n. 6 (2d Cir.1997) (approving district court's jury instruction that "[i]nformation is nonpublic if it is not available to the public through such sources as press releases, [SEC] filings, trade publications, analysts' reports, newspapers, magazines, rumors, word of mouth or other sources."), *cert. denied, Flanagan v. U.S.,* 522 U.S. 1133, 118 S.Ct. 1090, 140 L.Ed.2d 146 (1998); *U.S. v. Mylett,* 97 F.3d 663, 666 (2d Cir.1996) ("To constitute non-public information under the act, information must be specific and more private than general rumor."), *cert. denied, Cusimano v. U.S.,* 521 U.S. 1119, 117 S.Ct. 2509, 138 L.Ed.2d 1013 (1997).

### c. Misappropriation

The SEC relies on the "misappropriation theory" as the predicate for Section 10(b) and Rule 10b–5 liability in this case. Rather than focusing on an insider as the tipper, this theory of trading targets "outsiders to a corporation who have access to confidential information that will affect the corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders." *Dirks,*

463 U.S. at 653, 103 S.Ct. 3255. The misappropriation theory only bars trading on such information where the defendant violates a direct fiduciary or contractual duty to the holder of the "inside" information. *See id.* Thus, in *United States v. O'Hagan,* 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), the Supreme Court affirmed the misappropriation theory in a case with the same basic facts as those presented here: an alleged tipper who was a lawyer in a firm retained in connection with a proposed tender offer. The *O'Hagan* Court upheld liability for outsiders who pass on tips of inside information on the grounds that "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." 521 U.S. at 652, 117 S.Ct. 2199.

#### d. *Scienter*

To show that the defendants violated the antifraud provisions of the Exchange Act, the SEC must show that they acted with scienter, a state of mind that embraces the intent to deceive, manipulate or defraud. *Aaron v. SEC,* 446 U.S. 680, 686, n. 5, 700–01, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter may be established by showing recklessness, *see, e.g., SEC v. McNulty,* 137 F.3d 732 (2d Cir.1998), or by inferences based upon circumstantial evidence, *see Herman & MacLean v. Huddleston,* 459 U.S. 375, 390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

#### e. *Duty*

■ As a general matter, insider trading cases hold that a duty arises in cases where the person is an "insider," *see, e.g., SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968), a "temporary insider," *see, e.g., SEC v. Lund,* 570 F.Supp. 1397 (C.D.Cal.1983), an employee entrusted with confidential information by his employer, *see, e.g., SEC v. Materia,* 745 F.2d 197 (2d Cir.1984), or a tippee of any of the above who knew or should have known that the information was obtained in breach of a duty, *see Dirks,* 463 U.S. at 660, 103 S.Ct. 3255.

In misappropriation cases, the outsider-tipper's duty arises from his relationship to the source of the information rather than to the corporation's shareholders. *See O'Hagan,* 521 U.S. at 652–53, 117 S.Ct. 2199 ("the misappropriation theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information.").

Here, the SEC alleges that the source of the inside information was either Rafael Robles, or, more generally, the law firm of Franck, Galicia. Alejandro Duclaud, like any other attorney, owed a fiduciary duty to his law firm. *See id.,* 521 U.S. at 659–60, 117 S.Ct. 2199 (noting, without analyzing derivation of duty, that lawyer's deceptive trading based upon confidential information learned from law firm breached a fiduciary duty); *Graubard Mollen Dannett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 629 N.Y.S.2d 1009, 1012, 653 N.E.2d 1179 (1995) (noting that, under New York law, "law partners, no less than any other business or professional partners, are bound by a fiduciary duty requiring 'the punctilio of an honor the most sensitive'") (*quoting Meinhard v. Salmon,* 249 N.Y. 458, 463, 164 N.E. 545 (1928)).

#### 2. *Liability of Misappropriator for Trading and Tipping*

To hold Alejandro Duclaud liable for his own CompUSA trades under the misappropriation theory, the SEC must show

that he traded in securities while in knowing possession of material, nonpublic information in violation of a fiduciary duty to the source of the information. *Id.* Alejandro Duclaud may also be held liable for "tipping" if the SEC shows that he passed material, non-public information to another defendant in violation of his fiduciary duties. *See United States v. McDermott,* 245 F.3d 133, 138 (2d Cir.2001); *United Staets v. Cusimano,* 123 F.3d 83, 87 (2d Cir.1997), *cert. denied,* 522 U.S. 1133, 118 S.Ct. 1090, 140 L.Ed.2d 146 (1998).

### 3. *Liability of Tippees*

The SEC may establish liability on the part of any of the other individual defendants as "tippees" by showing that they received information from Alejandro Duclaud, the alleged "tipper," and that Duclaud "receive[d] a direct or indirect personal benefit from the disclosure, such as pecuniary gain or a reputational benefit that will translate into future earnings . . . [or that Duclaud made] a gift of confidential information to a [defendant who is Duclaud's] trading relative or friend." *Dirks,* 463 U.S. at 663–64, 103 S.Ct. 3255.

### B. *Section 14(e) and Rule 14e–3*

Section 14(e) of the Exchange Act and Rule 14e–3 promulgated thereunder similarly bar trading on inside information in the context of an impending tender offer. To establish liability pursuant to Rule 14e–3, the SEC must show that the defendants traded on the basis of material, non-public information concerning a pending tender offer that they knew, or had reason to know, had been acquired directly or indirectly from an insider of the offeror or issuer or someone working on their behalf. Rule 14e–3, 17 C.F.R. § 240.14e–3(a); *see also O'Hagan,* 521 U.S. at 669, 117 S.Ct.

2199. Unlike 10b–5 liability, the SEC need *not* establish that the information was disclosed in breach of a fiduciary duty to make out a violation of Rule 14e–3, *id.,* 521 U.S. at 670–72, 117 S.Ct. 2199; *Mayhew,* 121 F.3d at 49, but must nonetheless show that A. Duclaud had access to material, non-public information pertaining to a tender offer, and that he traded on it and/or passed it on to other defendants, who in turn relied on it in trading in CompUSA stock. Rule 14e–3 liability attaches when " 'substantial step or steps' have been taken to accomplish a tender offer" in a setting that is shielded from public scrutiny. *Id.,* 121 F.3d at 53.

## II. *Applicable Legal Standard for Obtaining a Preliminary Injunction in an SEC Action*

Section 21(d) of the Exchange Act authorizes the SEC to seek permanent or temporary injunctive relief whenever it appears that a person "is engaged or is about to engage in acts or practices constituting a violation of [the Act]." 15 U.S.C. § 78u(d). District courts may grant such relief "upon a proper showing," *id.,* which, as set forth below, depends on the nature of the relief sought, *see Unifund,* 910 F.2d at 1039.

### A. *Restraint Against Future Securities Law Violations*

To obtain a preliminary injunction enjoining future violations of securities laws, the SEC must make a "clear showing" of both (1) the likelihood of success by establishing a prima facie case of a past violation of the securities laws, and (2) a "reasonable likelihood" of future violations absent the injunction. *SEC v. Unifund SAL,* 910 F.2d 1028, 1037 (2d Cir.1990).[10]

---

**10.** As the SEC is "not . . . an ordinary litigant, but . . . a statutory guardian charged with

safeguarding the public interest in enforcing the securities laws," it need not make the

As the Second Circuit has noted, preliminary injunctions may have serious consequences, and "[l]ike any litigant, the commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks." *Id.* Although the Court may enter an injunction upon a proper showing of a violation of securities laws, "there is no per se rule requiring the issuance of an injunction upon the showing of a past violation." *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2d Cir.1977).

More rigorous scrutiny of the SEC's evidence in support of restraining future action is warranted where, as here, a legal professional is alleged to have capitalized on inside information in breach of a fiduciary duty. The allegation of such a violation that led the SEC to investigate is serious enough to eviscerate an honest lawyer's career if endorsed by a court based upon mere suspicion and innuendo. *See, e.g., SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1102 (2d Cir.1972) (approving district court's consideration of proposed injunction's effect on the reputation of defendant attorney). In *SEC v. Cavanagh,* 1 F.Supp.2d 337 (S.D.N.Y. 1998), the Honorable Denise L. Cote required the SEC to make a "substantial showing" to justify a future restraint against defendants, who included brokers and an attorney, because:

> [t]he reputational and economic harm of suffering a preliminary injunction, especially on charges of fraud, is also severe for individuals who make their living in the securities industry, such as [defendants]. These individuals stand to lose

typical showing of a likelihood of irreparable injury, favorable balancing of the equities, or the unavailability of a remedy at law. *SEC v.*

considerable business and respect in their communities if even a preliminary injunction is entered.

1 F.Supp.2d at 360. Here, too, a preliminary injunction would have "grave consequences" for defendants Alejandro Duclaud and Jose Antonio Duclaud, as attorneys in firms representing corporations in secured transactions, and Rodrigo Igartua and Ignacio Guerrero, who are professional financial advisors who make their living in the securities industry. *See Unifund,* 910 F.2d at 1040.

### B. *Asset Freeze*

■ To obtain a preliminary injunction preserving the status quo of freezing the defendants' assets, the SEC must demonstrate only (1) a concern that defendants will dissipate their assets or transfer them beyond the jurisdiction of the United States, and (2) a basis to infer that they traded on inside information. *See Unifund,* 910 F.2d at 1041. Like any private litigant, the SEC's burden of proof rises in relation to the hardship the injunction would create for the defendants. *See id.,* 910 F.2d at 1039. A freeze of assets is an ancillary remedy that merely "assures that any funds that become due can be collected," *id.,* 910 F.2d at 1041, including disgorgement of profits, penalties equal to three times the profits, *see* 15 U.S.C. § 78u-1 (1988), and possibly prejudgment interest, *see SEC v. Falbo,* 14 F.Supp.2d 508, 527–28 (S.D.N.Y.1998) (court has equitable discretion to award prejudgment interest). As such, courts may order a freeze even where the SEC has failed to meet the standard necessary to enjoin future violations of the securities laws. *Ibid.*

*Management Dynamics, Inc.,* 515 F.2d 801, 807–08 (2d Cir.1975); *see also Unifund,* 910 F.2d at 1035.

## CONCLUSIONS OF LAW

**III.** *The SEC has Failed to Demonstrate that A Preliminary Injunction Against Future Securities Laws Violations is Warranted, but Has Shown that the Asset Freeze Should be Continued as to Some of the Defendants*

**A.** *The SEC Has Failed to Make a Clear Showing that the Defendants Traded in Reliance on a Tip of Nonpublic Information*

**1.** *Tipper Liability for Alejandro Duclaud*

■ By the time Slim filed the 13G in September of 1999, national news outlets were reporting widespread speculation about a possible takeover of CompUSA. In a story about the 13G filing, Knight–Ridder reported on September 13, 1999 that "CompUSA has been the subject of persistent takeover rumors" and noted that "[s]hares in CompUSA rose 6 percent Friday as word spread on Internet chat boards about Mr. Slim's involvement." [11] Stock analysts were quoted as stating that "it is too early to speculate what the Slim family investment could mean for CompUSA," but nonetheless opined that "[i]f I were CompUSA, I'd take this as a vote of confidence that someone believes in the future potential of the company." [12]

The media speculation increased following Slim's 13D filing in late November of 1999. A December 9, 1999 Dow Jones News Service headline read, "Potential Influence of Mexican Mogul Moves CompUSA." [13] Later reports of the tender offer noted in retrospect that "CompUSA [had been] rumored as a takeover target for months." [14] *See also* David Koenig, *CompUSA Shares Soar on Buyout News*, Associated Press, 2000 WL 9750390 (Jan. 24, 2000) ("Analysts said Slim Domit switched from a passive to active investor in an early December filing with the U.S. Securities and Exchange Commission, under which he reserved the right to make proposals regarding CompUSA."). In short, by December of 1999, information regarding the prospect that Slim would attempt a takeover of CompUSA was publicly available in the form of "analysts' reports, newspapers, magazines, rumors, [and] word of mouth." *Cusimano*, 123 F.3d at 89 & n. 6. Importantly, public speculation was persistent before the defendants' first trades on January 6, 2000.

Public portents of an impending deal increased yet again during the week of January 17. An article reporting the tender offer announcement noted that "Grupo Sanborns' purchase of PC Retailer [CompUSA was] not unexpected, [and][s]hares of CompUSA inched up last week on rumors of a deal." [15] As set forth above, the increased share price mirrored the substantial increase in trading volume in Com-

11. Alan Goldstein and Dianne Solis, Mexican Tycoon Buys Stake in Dallas–Based Retailer CompUSA, The Dallas Morning News, 1999 WL 22014607 (Sept. 13, 1999).

12. Lila LaHood, Mexican Group Buys Stake in CompUSA, Ft. Worth Star–Telegram, 1999 WL 22015247 (Sept. 14, 1999).

13. DJNS 12/9/99 17:05:00.

14. Margret Johnston, *CompUSA Sold to Mexican Retailer*, PC World Online, 2000 WL

8855923 (Jan. 24, 2000); *see also* Leah Beth Ward, *Mexican Firm Buys CompUSA: Grupo Sanborns' purchase of PC Retailer Not Unexpected*, The Dallas Morning News, 2000 WL 7571547 (Jan. 25, 2000) ("In the fall, the Slim family reported a 14.8 percent position in CompUSA. At that time, investors speculated about a possible joint venture with the Dallas company....").

15. *Id.*

pUSA stock on January 19, 20 and 21, 2000, the final days before the tender offer was announced.[16] Coupled with this persistent media speculation and Halpin's public testimony on January 18, 2000, the substantial increase in trading volume on January 20 and January 21—only a small fraction of which was attributable to the defendants—undermines the SEC's argument that the defendants relied on nonpublic information to make their trades on these dates.

To show a likelihood that the defendants traded in reliance on nonpublic information—a crucial component of a prima facie case for a violation of securities laws—the SEC must establish that Alejandro Duclaud had access to, and passed on, information that was "specific and more private than [these] general rumor[s]." *Mylett,* 97 F.3d at 666. *See also Mayhew,* 121 F.3d at 50–52 (holding that despite rumors in the press that Rorer Group Inc. was a takeover or merger candidate and was conducting talks with three companies, defendant tippee was made privy to material insider information that "went beyond that which has been publicly disseminated" including confirmation that Rorer was in serious merger negotiations).

The SEC argues that as a partner in Franck, Galicia, Duclaud had access to nonpublic information pertaining to Slim's plans for CompUSA, which included the possibility of a tender offer "no later than December 3, 1999." (Compl. ¶ 24.)[17] As such, Duclaud could have gained access to inside information by one of two ways:

through Rafael Robles, or through his own Slim connections.

In support of the first theory, the SEC suggests that Rafael Robles had knowledge of Grupo Sanborns's plans for CompUSA as early as September 13, 1999, when Robles's name appeared as counsel on the cover of the Schedule 13–G filing. However, the defendants each argue that they became aware of the filing over the internet, which did not include the cover page reflecting the involvement of Robles, before making their trades. (A. Duclaud Aff. ¶¶ 12–13.) Moreover, Robles himself avers that in 1999 his only action for Grupo Sanborns was to review the Schedules 13–G and 13–D before they were filed, and only became aware of Slim's plans for CompUSA on January 20, 2000. (A. Duclaud Aff. ¶ 17, Ex. A (unsigned draft Robles Aff.).) The chronology Cleary, Gottlieb provided to the SEC confirms that Robles had no knowledge of the impending deal before he was contacted during the afternoon of January 20, 2000. (Tomback Decl. Ex. W at AD 10254.). The SEC has presented no evidence to rebut this independent proffer. Thus, the record as it currently exists demonstrates that the defendants could not have had access to *any* inside information through Franck, Galicia, prior to making their first CompUSA trades beginning on January 6, 2000.

In support of the second theory, the SEC cites Alejandro Duclaud's deposition testimony, and notes that he has done work for Slim in the past, has a Rolodex containing multiple entries for Slim and his associated entities, and shares a secre-

---

**16.** The increase in trading volume also took place immediately after the January 18, 2000 testimony of Halpin at the Dallas preliminary injunction hearing, which portended a possible takeover bid by Slim.

**17.** The Complaint apparently relies on the timeline provided by Cleary, Gottlieb, which

reflects that during the week of November 29, 1999, Grupo Sanborns executives began discussions with CompUSA in which Grupo Sanborns expressed possible acquisition valuations but made no specific proposals. (Tomback Aff. Ex. W at AD 0010253.)

tary with an associate who regularly works on Slim-related matters. (A. Duclaud Tr. at 41–48, 85–90, 275; Duclaud Ex. 3.) Yet, at this stage, the SEC has proffered no evidence of any actual pre-trading contact between Alejandro and any insider privy to (or even aware of) the discussions between Grupo Sanborns and CompUSA, much less a concrete tip from Duclaud that could have prompted the defendants to trade in CompUSA stock as early as January 6, 2000.

Although circumstantial evidence of a defendant outsider's access to nonpublic information and an opportunity to pass it to tippees might otherwise suffice, more is required where, as here, media speculation of a takeover was widespread, and defendants made more than half of their CompUSA stock purchases on days in which the company's trading volume was rising exponentially. *See Falbo*, 14 F.Supp.2d at 522 (noting that "information may be considered public for Section 10(b) purposes even though there has been no public announcement and only a small number of people know of it. The issue is not the number of people who possess it but whether their trading has caused the information to be fully impounded into the price of the particular stock."). The SEC has proffered no evidence that A. Duclaud had access to any *specific* information pertaining to CompUSA and/or Grupo Sanborns such as to justify a finding that he traded on the basis of nonpublic information in violation of Rule 10b–5, or that he had information pertaining to the tender offer in particular, as required by Rule 14e.

### 2. *Tippee Liability*

■ The SEC argues that payments by Ignacio Guerrero to Alejandro Duclaud on two occasions in 1999 were in fact commissions for inside information about Slim's investment plans in other companies, sup-

porting the theory that Duclaud tipped his friends and family to the impending CompUSA deal.

On May 6, 1999, Guerrero purchased five million shares of the Mexican bakery chain, El Globo, which had not traded the previous day and had a total volume of 54,000 shares on the two prior trading days. Later that day, Grupo Sanborns began buying 60% of El Globo's outstanding shares. After Slim's investment in El Globo was made public on May 7, 1999, Guerrero sold all five million shares for a profit of more than $350,000. On May 13, 1999, Guerrero wired $155,400 from his Banrise account to Alejandro Duclaud's Anushka Trust.

The same pattern emerged when, from October 21 to November 18, 1999, Guerrero accumulated 56,100 shares in Prodigy Communications ("Prodigy"), which was controlled by Slim companies. On November 22, 1999, Prodigy announced a business venture with SBC Communications, prompting Prodigy's stock price to increase 35%. Guerrero sold his Prodigy shares for a profit of $607,416 that day and wired approximately $148,300 from his Banrise account to Alejandro Duclaud's Anushka Trust two days later. The document signed by Duclaud authorizing the transfer referred to the funds as "payment for rendering legal counsel services." (Beerbower Aff. Ex. L.)

Guerrero and Duclaud assert that these payments were made in satisfaction of previously existing debts, not as a payoff for inside information, and suggest that there is nothing suspicious about paying a legitimate debt after liquidating a profitable investment. First, Duclaud has testified at deposition that he has occasionally performed legal work for his friend Ignacio Guerrero, which he bills personally, rather than through Frank, Galicia. (Beerbower Aff. Ex. D (A. Duclaud Tr. at 75–80).)

Duclaud explains that the $155,000 transfer from Guerrero on May 13, 1999 was reimbursement for legal services Duclaud performed for him in connection with Guerrero's divorce, estate planning, and a corporate matter. (A. Duclaud Tr. 131:23–133:25; Guerrero Tr. 146:13–147:24.).

Second, Duclaud and Guerrero explain that the November 24, 1999 transfer of approximately $148,300 to him, was in payment for a Mexico City apartment he sold Guerrero earlier that month. (A. Duclaud Br. at 11 & n. 9; Guerrero Br. at 1–2 & n. 1.) Although neither man has documentation of the sale, Alejandro's younger brother, Javier Duclaud Gonzalez de Castilla, has submitted an affidavit attesting that he resided in the apartment from February to August of 2000, with the permission of both Alejandro and Guerrero, while work on his own house was being completed. (Javier Duclaud Aff. ¶¶ 4–8.)

Even if the SEC's view that these transactions represented kickbacks for inside information is credited, there is no evidence of any such suspiciously timed transfers to A. Duclaud as a result of CompUSA trades. *Cf. SEC v. Warde*, 151 F.3d 42, 48 (2d Cir.1998) (finding tippee liability because "the tip and trade resemble trading by the insider himself *followed by* a gift of the profits to the recipient.") (*quoting Dirks*, 463 U.S. at 664, 103 S.Ct. 3255 (emphasis added)).

In sum, the SEC has not made the "clear showing" of a likelihood of success necessary to enter an order preliminarily enjoining the defendants from violating securities laws in the future. As the SEC has failed to sustain its burden to show that the defendants traded in reliance on a tip about nonpublic information, the motion to enjoin the defendants from future securities law violations is denied.

**B. The SEC Has Met Its Burden to Obtain an Extension of the Asset Freeze Against Each Defendant Except Pablo Velazquez, Maricruz Lozano Ledzma, and Elvira Baranda Garcia**

■ Although it failed to make the showing necessary to enjoin the defendants from violating the securities laws in the future, the SEC has presented sufficient facts to raise an inference that Alejandro Duclaud had access to material, nonpublic information. This showing is sufficient to warrant continuing the analysis under the lesser standard applicable for extending the asset freeze.

**1. The SEC Has Raised an Inference that Alejandro Duclaud Misappropriated Inside Information**

Based upon the unquestionably close personal and familial relationships between the individual defendants, it is reasonable to infer that Alejandro Duclaud had the opportunity to tip them as to the impending CompUSA deal. *Cf. Unifund*, 910 F.2d at 1041 (reversing district court's finding that "commonality of surnames" defendants and insiders was probative of the existence of a tip). Moreover, as Alejandro Duclaud is a legal professional who is familiar with fiduciary duties, assuming he did pass on information he learned through Franck, Galicia, it is also reasonable to infer that he knew the substance of the tip was not intended for public consumption and had a duty not do disclosure it.[18]

---

18. That A. Duclaud failed to disclose his CompUSA trading to anyone else at his eight-partner law firm is also probative in this inquiry. In *O'Hagan,* the Supreme Court noted that "[d]eception through nondisclosure is central to the [misappropriation] theory of liability." 521 U.S. at 655, 117 S.Ct. 2199. In that case, which also involved an outsider

In sum, in the totality of circumstances, the SEC has raised an inference that Duclaud was a "tipper" who misappropriated inside information in violation of a fiduciary duty to its source. Even aside from the question whether Alejandro Duclaud attempted to transfer funds out of the country in an attempt to protect them from the SEC's reach after his account was frozen, his status as a citizen and resident of Mexico with accounts at Mexican banks raises a danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his account did not remain frozen. *See U.S. v. First National City Bank*, 379 U.S. 378, 384, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965) (district court's issuance of temporary injunction freezing assets of non-party bank "eminently appropriate to prevent further dissipation of assets" from foreign corporation's account); *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 215–16, 65 S.Ct. 1130, 1132, 89 L.Ed. 1566 (1945) (holding, in antitrust action, that "sequestration of [defendants'] property is the only means of enforcing this Court's orders or decree against said foreign corporate defendants. The principal business of said defendants is carried on in foreign countries and they could quickly withdraw their assets from the United States and so prevent enforcement of any order or decree which this Court may render.").

### 2. *The SEC Has Raised an Inference that the Other Defendants Received Tips from Alejandro Duclaud*

■ While the defendants' explanations of the post-trading payments from Guerrero to A. Duclaud are plausible, they are, in effect, undocumented. As such, the defendants have not dispelled the reasonable inference that the wire transfers between Guerrero and A. Duclaud immediately after Guerrero made lucrative trades on Slim-controlled companies were in fact payoffs for tips on inside information. Moreover, Alejandro Duclaud, Guerrero, Igartua, Jose Antonio Duclaud (and the defendants who shared their brokerage accounts—Ana Igartua and Martha Baranda) purchased CompUSA stock in significant proportion to the trading volume prior to January 21, 2000. An inference could be drawn from the evidence to support the SEC's theory that Duclaud tipped Guerrero, who in turn passed the information to Igartua, who passed it to the other defendants in his capacity as their financial advisor and/or family member.

As such, and because each of these defendants is a citizen and resident of Mexico with Mexican and other off-shore bank accounts (and therefore the capacity to transfer the funds beyond the jurisdiction of this Court), the SEC has met its burden to justify extending the asset freeze until the trial or resolution of this matter. *See First National City Bank*, 379 U.S. at 384, 85 S.Ct. 528; *De Beers*, 325 U.S. at 215–16, 65 S.Ct. 1130; *SEC v. Margolin*, No. 92 Civ. 6307(PKL), 1992 WL 279735, at *6 (S.D.N.Y. Sept. 30, 1992) (noting danger of dissipation of assets via off-shore accounts).

Although the defendants' nationality, standing alone, is insufficient to warrant freezing their assets, the freeze is justified because (1) the SEC has raised an inference of insider trading; and (2) the fact

---

defendant who was a lawyer at a firm representing a corporation contemplating a tender offer, the Court held that "it was O'Hagan's failure to disclose his personal trading to [acquiring company] and [his law firm], in breach of his duty to do so, that ma[de] his conduct deceptive within the meaning of § 10(b)." *Id.*, 521 U.S. at 660, 117 S.Ct. 2199 (internal quotations omitted)

that the defendants live abroad and use off-shore accounts raises a concern that they may transfer their funds beyond the Court's jurisdiction and dissipate the assets available for any eventual award. *See Unifund*, 910 F.2d at 1041. In short, the SEC's motion to extend the freeze on the assets of A. Duclaud, J. Duclaud, R. Igartua and A. Igartua, is granted.

The freeze shall continue until this matter comes to trial. Citing *Unifund*, the defendants have argued that the freeze, if extended, should continue for only thirty days so as not to interfere with their unrestricted use of their assets. The *Unifund* Court, finding that the SEC had made a similarly meager showing, ordered the freeze to continue for thirty days, 910 F.2d at 1042–43, and clarified upon reargument that its intent was not to extend the freeze through the completion of discovery, *SEC v. Unifund SAL*, 917 F.2d 98, 99 (2d Cir. 1990) ("*Unifund II*").

However, the terms and duration of the freeze order fall within this Court's "broad equitable powers to grant ancillary relief." *S.E.C. v. American Bd. of Trade, Inc.*, 830 F.2d 431, 438 (2d Cir.1987) (citation and internal quotations omitted). The Court in *Unifund II* specifically noted that "we did not intend to establish any particular time period as the duration for freeze orders in subsequent insider trading cases" when deciding *Unifund I*, but that "district courts retain ample discretion to assess all the relevant circumstances and, in those cases where the Commission has demonstrated entitlement to a freeze order, to determine the coverage, terms, and duration of that order." 917 F.2d at 99.

In the exercise of that discretion, and after having considered the level of proof and relative burdens on the parties, the status quo shall be continued until the completion of the trial or the resolution of this action by mutual agreement of the parties.

### 3. The SEC Has Failed to Raise an Inference that the Velazquez Defendants Traded in Reliance on Inside Information

■ Pablo Velazquez did not purchase CompUSA stock until January 21, 2000. The SEC suggests that the timing of his purchase on the last day before the tender offer was announced (and the stock price soared) was suspicious, rather than merely fortuitous. Without some additional showing, however, this evidence does not support an inference that Velazquez relied on inside information, because the media was actively engaging in takeover speculation at that time, and the trading volume of CompUSA stock had doubled on the day before he traded, and doubled again on the day he traded. The trading volume reflects that the "word was out" to the investing public by January 21, 2000. In this context, the SEC must proffer more proof in order to raise the inference that Velazquez traded in reliance on inside information. *See, e.g., O'Hagan*, 521 U.S. at 648, 117 S.Ct. 2199 (noting relevance of public reports to sufficiency of evidence that defendants traded in reliance on non-public information).

As such, the SEC has not met its burden to continue the freeze on the assets held by Velazquez, or by Maricruz Lozano Ledezma and Elvira Baranda Garcia, who are signatories on his Lehman Brothers joint brokerage account.

### Conclusion

For the foregoing reasons, the motion for a preliminary injunction restraining the defendants from violating the securities laws in the future is denied, and the motion for a preliminary injunction extending the asset freeze is granted as to every defendant except Pablo Velazquez, Mari-

cruz Lozano Ledezma, and Elvira Baranda Garcia, as to whom the motion is denied and the freeze hereby lifted.

The assets of the remaining defendants shall remain frozen until the parties reach a disposition by mutual agreement, or until the conclusion of the trial in this matter, which shall be scheduled at a pretrial conference to be held during the first week in September 2001, at the mutual convenience of the parties. Each freeze order is subject to modification for hardship upon the proper application of any defendant.

It is so ordered.