**UNITED STATES of America,
Plaintiff,**

v.

**Joseph FALCONE, Defendant.**

**No. 99–CR–332.**

United States District Court,
E.D. New York.

May 12, 2000.

Michael Cornacchia, Demetri Jones, (Assistant United States Attorneys, E.D.N.Y., Long Island, NY,), for government.

John Laurence Kase, Garden City, New York, (Kase & Drucker), J. Jay Lobell, New York City (Covington & Burling), for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

On November 1, 2, 3, 4, 8 and 9, 1999 the defendant, Joseph Falcone, was tried before a jury, culminating in a guilty verdict for insider trading in violation of 15 U.S.C.A. § 78j(b) and 17 C.F.R. § 240.10b–5.[1] On December 23, 1999 the

---

1. Section 10(b) provides in relevant part:

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
 (b) To use or employ, in connection with the purchase or sale of any security on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

 [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 Rule 10b–5 states:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme or artifice to defraud,

defendant filed a motion pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure to set aside the verdict. The Government submitted opposition papers on February 18, 2000 and the defendant filed a reply brief on March 17, 2000. As is discussed below, upon much deliberation, it is with real reluctance that this Court feels that it must affirm the defendant's conviction.

## BACKGROUND

The relevant facts adduced at trial are as follows. The McGraw–Hill Company publishes a weekly article in its Business Week magazine authored by Gene Marcial entitled "Inside Wall Street." (Tr. at 67–68). The column generally evaluates three companies with the intention of giving "readers sort of an inside look at certain stocks that trade on Wall Street." (Id. at 68). Marcial accomplishes this task by "talk[ing] to CEOs, ... money managers, people who manage money for mutual funds or hedge funds ... [and] top analysts." (Id.).[2]

The Inside Wall Street article is available on newsstands on Friday and is re-

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

**2.** It was acknowledged at trial that part of Business Week's profits are based on inside information, albeit not directly from the purchase or sale of securities, which is not reported to the Securities and Exchange Commission ("SEC") (Id. at 113–115).

**3.** With regard to this policy, an inter-office memorandum of Business Week dated March 12, 1986 from Steve Shepard states as follows:

For many years now, BUSINESS WEEK, has had a policy that prohibits the distribution of early copies of the magazine on Thursday. The reason: because the magazine contains information that could affect

leased on the Internet approximately 5:00 p.m. E.S.T. on Thursday's. (Id. at 134). To ensure that the release times are adhered to, Business Week follows stringent security procedures. Testimony was established that at the Business Week headquarters in Manhattan the column is placed in a queue and "[o]nly certain people on the magazine have access to that queue." (Id. at 75–76). Moreover, when the article is written, the names of the relevant stock are not inserted until Wednesday at 5:00 p.m. (Id. at 77). In its final version, a single copy of the column is placed in a red folder and "[i]t is sequestered and locked in [the] copy editor's desk." (Id. at 78).

In addition to these procedures, it is Business Week's policy that no writer, editor or reporter is permitted to buy or sell stock on a subject matter that he has worked on until two weeks after the information has been divulged to the public. (Id. at 127). Furthermore, if an employee reports on a particular stock with regularity, the individual is barred indefinitely from purchasing such stock. (Id).[3]

the performance of stocks, the SEC considers such release to be inside information if it reaches anybody before it is released to the general public.

I think it's time to reiterate our policy on release of the magazine and information in it. Our policy is that the contents of the magazine are *off limits* to anyone outside the BUSINESS WEEK staff until 5:00 p.m. EST on Thursday. That is when the magazine is released to the press and to the public. No exceptions.

Editorial sources are not to be told the publication date of a story. BUSINESS WEEK advertisers are not to be told that a story about their company is appearing in the issue. No one is to be told a story is positive or negative. If an editorial source or advertising client calls to request a copy of the magazine because they *think* they might be in the magazine, no information can be released until Thursday at 5:00 p.m.

We must adhere to this policy to avoid any conflict with SEC rules.
(Gov't Exh. 18).

After the article is completed, numerous intermediaries are in possession of the information before it reaches the general public. From Business Week the column is transmitted electronically to Applied Graphics Technology ("AGT"). This facility has also implemented security measures regarding the article in that an individual can only have access to the file after inserting a series of passwords. (Tr. at 135–136). From AGT the information is then electronically transmitted to three printing plants, namely, R.R. Donnelly Printing Plant in Torrence, California, R.R. Donnelly Printing Plant in Old Saybrook, Connecticut and Perry Printing in Waterloo, Wisconsin. (*Id.* at 136).

As with Business Week, exacting security procedures are enforced at the printing plants. For instance, testimony was elicited noting that the excess paper is shredded in a bailing room "[b]ecause no one in the printing plant is supposed to have access to any of the contents of Business Week unless it is strictly job related." (*Id.* at 138). Concomitantly, the plant personnel are informed that during the binding process employees are prohibited from perusing the material. (*Id.* at 139).

Testimony also established that in 1995 and 1996, Thomas Tully, the General Manager of Postal Affairs and Compliance for McGraw–Hill, distributed reminder letters to the printing plants detailing the security procedures.[4] Such letters were circulated on an annual basis. (*Id.* at 142). In addition, plant personnel were to place notices on the premises detailing Business Week's concern for confidentiality. (*Id.*).

After the printing process, Business Week was next disseminated to a national distributor of magazines, Curtis Circulation Company ("Curtis") in West Milford, New Jersey. (*Id.* at 160–161). Curtis, in turn, sold Business Week to various wholesalers. One such wholesaler was Hudson News ("Hudson"). (*Id.* at 161–162). To enforce the mandate of the McGraw–Hill Company, Curtis issued a policy statement to the wholesalers, including Hudson, noting that Business Week should not be distributed until after 5:00 p.m. on Thursday's. (*Id.* at 162–163). It was also established at trial that during the 1990's, Curtis sent representatives to Hudson to conduct an inventory of the Business Week magazine to ensure that this policy was adhered to. (*Id.* at 179–181).

Evidence was further presented concerning the policies of Hudson with regard to the magazine. Business Week arrived at Hudson between 10:00 a.m. and 1:30 p.m. on Thursday's. (*Id.* at 170). For security purposes and because "the information in that magazine is held very closely" it was company policy that employees were not allowed to take the magazine from the delivery department. (*Id.* at 170–172). It was further established that "[u]nder the company policy posted in the work rooms, employees who took magazines from the delivery department … were discharged." (*Id.* at 172).[5] A Hudson employee testified that the underlying reason for this rule was that the magazines were "a product entrusted to Hudson News that didn't belong to us. It be-

4. Tully testified that the security procedures at the printing plants were in sum: "[N]o one should have access to Business Week or any of its contents without specific authorization from the McGraw–Hill companies, and that has to be generally in writing. Plant personnel can only have access during the course of their duties and responsibilities. No copy should leave the printing plant on Thursdays, except for specific written instructions for the dispatches of newsstands or subscription copies. If anyone tries to get access or gain

access to the magazine or any part of the magazine, either in person, in writing, verbally, by telephone … I was to be notified immediately." (*Id.* at 141–142).

5. For instance, Hudson's General Rules stated in relevant part: "Theft of merchandise or other company property will subject the employee to **immediate discharge.**" (Gov't Exh. 23) (emphasis in original).

longed to the publisher. They entrusted it to us." (*Id.* at 184).[6]

Business Week ensured that the aforementioned security procedures were adhered to by following the performance of the stocks discussed in the "Inside Wall Street" article. (*Id.* at 94–95). In 1995, Seymour Zucker, the Senior Editor of Business Week (*id.* at 66), noticed an abnormal trading pattern among the stocks mentioned in the column and concluded that individuals were obtaining information discussed in the article prior to release to the general public. (*Id.* at 102–103). As a result, in January 1996 an article entitled "Is Someone Sneaking a Peek at Business Week?" was written in the magazine in an effort to curb this practice and promote a "level playing field." (*Id.* at 105–107) (Gov't Exh. 17D). In addition, Business Week alerted the S.E.C. of their suspicion. (*Id.* at 106). Interestingly, after the article was written, the abnormality ceased. (*Id.* at 108).

It was subsequently discovered that the rise of stock price prior to the article's release was due in part to the following scheme. Gregory Salvage was a foreman at Hudson and had been employed by the company for twenty-two years (*Id.* at 194–195). Thus, he was fully apprised of Hudson's policy with regard to the Business Week magazine. (*Id.* at 197–198). Nevertheless, out of the prompting of a neighborhood friend and broker, Larry Smath (*id.* at 199), Salvage arranged for Smath to receive the "Inside Wall Street" article before it was made available to the general public so that he could trade on the stock and thereby realize a significant profit. (*Id.* at 205).

To facilitate in this process, Salvage contacted one of his subordinates in the day shift, Ryan Mohammed, and requested him to fax the "Inside Wall Street" article to Smath, primarily at his workplace, prior to the close of the market on Thursday's. (*Id.* at 206–8). For his efforts, Salvage was paid two-hundred dollars ($200) for each article that Smath received. (*Id.* at 208). In all, the transactions occurred approximately fifteen times. (*Id.* at 208–209). Salvage in turn paid Mohammed twenty-five dollars ($25) for each faxed copy. (*Id.* at 209).

At the outset of receiving this information, Smath phoned Joseph Falcone, the defendant, a broker at Prudential Securities and told him to "[w]rite down these symbols. Don't ask any other questions." (*Id.* at 386). Smath and Falcone subsequently met that weekend at the latter's house. (*Id.* at 391). According to Smath, he informed Falcone of the intricacies of this scheme and in particular, the details concerning his surreptitious receipt of this information. (*Id.* at 392–395). Smath further testified that he asked Falcone to pay him two hundred dollars ($200) for each time he was able to phone him before 4:00 p.m. on Thursday with the names of the stocks in the column. (*Id.* at 395–397). In total, Smath estimated that he received this monetary amount from Falcone between ten and twelve times. (*Id.* at 410).[7] In total, Falcone's profit for these activities was a mere $4,898.38. (*Id.* at 311).

In contradiction to Smath's testimony, at the trial the defendant asserted that he

---

6. It was adduced at trial that Hudson distributed other financial magazines such as Forbes, Fortune and Money which also had columnists' advice with respect to particular securities and they did not have restrictions similar to Business Week. (Tr. at 187–188). With this in mind, the Court questions the validity of creating a federal criminal security violation because of self-imposed rules which are not shared by other magazines similarly situated.

Given the fact that the other publications do not feel the need for these extensive security measures, one can only wonder whether financial gain from the cloak of secrecy may not be the real motive here.

7. For clarity of the record, fellow brokers of Smath's at Renaissance Capital, Seth Glaser and Peter Cohen, were also involved in this scheme and likewise agreed to pay Smath collectively two-hundred dollars ($200) for each transaction. (*Id.* at 400–401).

was unaware Smath was receiving this information from Business Week until the "Sneak a Peek" expose' was published. (*Id.* at 825). Rather, the defendant stated he was under the belief that Smath was obtaining the stock tips from his trader. Falcone further testified that the only time he exchanged money with Smath was to give him change for a Mickey Mantle baseball he purchased for Smath's son. (*Id.* at 806).

Based on this evidence, Falcone was convicted by a jury for insider trading. It is at this juncture that the defendant moves to set aside the verdict.

## DISCUSSION

Section 10(b) provides in relevant part: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C.A. § 78j(b) (1997).

Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a mate-

rial fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Under classical insider trading, the proscriptions of Rule 10b–5 are violated "when a corporate insider trades in the securities of a corporation on the basis of material, nonpublic information." *United States v. O'Hagan,* 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). The Supreme Court noted that "[t]rading on such information qualifies as a 'deceptive device' under § 10(b) ... because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'" *Id.* (quoting *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)).[8]

 In addition to traditional insider trading, the Supreme Court has recently held that an individual may be criminally liable under Section 10(b) and Rule 10b–5 on the basis of the misappropriation of such information. *Id.* at 650, 117 S.Ct. 2199. The contours of this theory are as follows:

The 'misappropriation theory' holds that a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b–5, when he misappropriates confidential information for securities trading purposes, *in breach of a duty owed to the source of the information.* Under this theory, a fiduciary's undisclosed, self-

---

**8.** It should be noted that there is no allegation here that any of the information in the hands of the defendant was taken by a corporate "insider" by reason of his/her position with that corporation and passed along to Business Week or anyone else.

serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information. In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.

*Id.* at 652, 117 S.Ct. 2199. (emphasis supplied).

This Circuit has elaborated upon this alternative theory of liability. *See e.g. United States v. Cusimano,* 123 F.3d 83, 87 (2d Cir.1997) *cert. denied, Flanagan v. United States,* 522 U.S. 1133, 118 S.Ct. 1090, 140 L.Ed.2d 146 (1998); *United States v. Mylett,* 97 F.3d 663, 667 (2d Cir.1996), *cert. denied, Cusimano v. United States,* 521 U.S. 1119, 117 S.Ct. 2509, 138 L.Ed.2d 1013 (1997); *Securities and Exchange Commission v. Materia,* 745 F.2d 197, 203 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *United States v. Teicher,* 987 F.2d 112, 119 (2d Cir.1993), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993); *United States v. Chestman,* 947 F.2d 551, 566 (2d Cir.1991), *cert. denied,* 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992).

■ In fact, one Second Circuit precedent expounding on the misappropriation theory, *United States v. Libera,* 989 F.2d 596 (2d Cir.1993) (Winter, J.), *cert. denied, Sablone v. United States,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993), is much akin to the case at hand. Indeed, *Libera* involved the same magazine—Business Week,—the identical article—Inside Wall Street,—and the corresponding confidentiality measures. It is due to such case law that this Court is constrained and thus bound to affirm the conviction.

However, this affirmance is not without concern of the boundless expansion of the misappropriation theory. In the instant case, it is highly questionable whether the participants at hand breached a *fiduciary duty to the source of the information* — Business Week. *See Teicher,* 987 F.2d at 119; *Materia,* 745 F.2d at 203. Here, Salvage and Mohammed were employees of Hudson and thus were vastly removed from the source of the confidential information.[9] In fact, three intermediaries—namely, AGT, Donnelly, and Curtis—preceded Hudson's participation in the dissemination process.

Indeed, the Second Circuit has expressed disquietude toward expanding the contours of a fiduciary duty in this context by noting: "[W]e tread cautiously in extending the misappropriation theory to

---

**9.** Indeed the caveat in the *O'Hagan* case would seem to be very applicable here viz:

> The misappropriation theory targets information of a sort that misappropriators ordinarily capitalize upon to gain no-risk profits through the purchase or sale of securities. Should a misappropriator put such information to other use, the statute's prohibition would not be implicated. The theory does not catch all conceivable forms of fraud involving confidential information; rather, it catches fraudulent means of capitalizing on such information through securities transactions.

> The Government notes another limitation on the forms of fraud § 10(b) reaches: "The misappropriation theory would not ... apply to a case in which a person defrauded a bank into giving him a loan or embezzled cash from another, and then used the proceeds of the misdeed to pur-

chase securities." Brief for United States 24, n. 13. In such a case, the Government states, "the proceeds would have value to the malefactor apart from their use in a securities transaction, and the fraud would be complete as soon as the money was obtained." Ibid. In other words, money can buy, if not anything, then at least many things; its misappropriation may thus be viewed as sufficiently detached from a subsequent securities transaction that § 10(b)'s "in connection with" requirement would not be met. Ibid.

*O'Hagan,* 521 U.S. at 656–657, 117 S.Ct. 2199. So also here, the fraud may be complete with the payment of monies to the two embezzlers or thieves and the "misappropriation" may be viewed as sufficiently detached from subsequent securities transactions that 10(b)'s "in connection with requirement" has not been met.

new relationships, lest our efforts to construe Rule 10b–5 lose method and predictability, taking over 'the whole corporate universe.'" *Chestman*, 947 F.2d at 567 (quoting *United States v. Chiarella*, 588 F.2d 1358, 1377 (2d Cir.1978) (Meskill, J. dissenting)). It is to this Court's dismay, that such concerns have gone unheeded.

Moreover equally, if not more significant, are the basic principles of criminal law that (1) penal laws are to be construed strictly; (2) a statute must be sufficiently clear and definite on its face with minimal guidelines to govern law enforcement to survive a challenge of vagueness; (3) and in the instant case, the so-called misappropriation theory bars only trading on the basis of information that the wrongdoer (the defendant herein) converted to his own use in violation of some fiduciary, contractual or similar obligation to the owner or rightful possessor (in this case, Business Week).

One might legitimately argue that Mohammed stole or embezzled the article and hence the information from his employer, Hudson, and hence from Curtis, Donnelly, AGT and Business Week, and therefore Salvage, Smath and the defendant were specifically and at most possessors of stolen or embezzled goods knowing the same to be such—a common statutory crime. Thus this Court questions whether the less precise language in the Securities Act is sufficiently clear and definite to criminalize the use of information by the defendant in this case. The key, it seems, is whether a common understanding of a fiduciary duty "to the owner or rightful possessor of the

information" may be extended to the limit sought here. Were we writing on a clean slate we would be inclined to hold otherwise because it appears to violate all three of the above basic principles and gives every appearance of "non-statutory made" criminal law.

 However, with considerable reluctance, because we must adhere to the governing precedent, the jury verdict must stand.[10]

## CONCLUSION

For the foregoing reasons, the defendant's motion to set aside the verdict pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure is DENIED.

SO ORDERED.

---

10. The defendant argues that the Court erred by referring to Smath as the tipper rather than as a tippee. (Df.'s Mem. in Supp. at 21). On this point FED.R.CRIM.P. 30 states: "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Since there was no objection to this charge, in order to grant a new trial there must be plain error that substantially affects the defendant's rights. *United States v. Rossomando*, 144 F.3d 197,

200 (2d Cir.1998). Under the Government's view, here Smath was a tippee. But as the Court sees it, in relation to Falcone, Smath was a tipper. Thus, since this instruction is not in plain error and does not substantially affect the defendant's rights, Falcone is not entitled to a new trial on this ground.

As an aside, it should be noted that if the Government's view of both Smath and Falcone as tippees was taken to its logical conclusion, the defendant would have no fiduciary duty to Smath and therefore no liability under the security laws.