UNITED STATES of America,
Appellee,

v.

Joseph FALCONE, Defendant–
Appellant.

No. 00–1768.

United States Court of Appeals,
Second Circuit.

Argued May 16, 2001.

Decided July 20, 2001.

John Laurence Kase, (Paula Schwartz Frome, on the brief), Kase & Druker, Garden City, NY, for defendant-appellant.

Michael Cornacchia, Assistant United States Attorney, for the Eastern District of New York, (Loretta E. Lynch, United States Attorney, Peter Norling, Demetri M. Jones, Assistant United States Attorneys, Eastern District of New York, on the brief), Brooklyn, NY, David M. Becker, General Counsel for The Security and Exchange Commission, for appellee.

Before: FEINBERG, VAN GRAAFEILAND, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

Defendant Joseph Falcone appeals from a judgment of the United States District Court for the Eastern District of New York (Platt, *J.*) convicting him after a jury trial of thirteen counts of securities fraud, in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("section 10(b)"), and one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, based on the "misappropriation theory" of insider trading. The charges arose from a scheme involving the misappropriation of pre-release confidential copies of a magazine column that discussed securities for the purpose of trading in the securities of the featured companies. In challenging the district court's finding that this case is governed by this Court's decision in *United States v. Libera,* 989 F.2d 596 (2d Cir. 1993), which upheld a conviction based on a similar scheme, defendant argues on appeal that *Libera* should not govern the result in this case because: 1) under the Supreme Court's more recent decision in *United States v. O'Hagan,* 521 U.S. 642,

117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), the misappropriations at issue in both *Libera* and the instant case would not satisfy section 10(b)'s requirement that the misappropriation be "in connection with" the purchase or sale of a security; and 2) this case is materially distinguishable from *Libera.*[1] We disagree and affirm the judgment of conviction.

## BACKGROUND

Defendant's conviction arose from his participation in a scheme in which an employee of Hudson News, a magazine wholesaler, faxed a stockbroker acquaintance of defendant's, Larry Smath, pre-release confidential copies of a column in *Business Week* magazine—"Inside Wall Street"— that discussed companies and their stocks. *Business Week* is a weekly financial publication owned by McGraw–Hill, Inc. Smath himself used the information to trade securities and also passed the information along to defendant, who likewise traded in the securities discussed in the column.

Evidence was introduced at trial indicating that the value of stocks discussed favorably in the column tended to increase after the magazine was released to the public and that, because of this impact, *Business Week* imposed a strict confidentiality policy prior to that release on all those involved in the magazine's production and distribution. This policy applied to Hudson News and was implemented through a broader company policy, applicable to all the magazines Hudson News distributed, prohibiting employees from taking copies of the magazines or portions

---

**1.** Defendant also urges this court to "re-evaluate" *Libera*'s consistency with other Second Circuit precedent. However, it is well-settled that "one panel of this [C]ourt may not overrule the decision of a prior panel" except "where an intervening Supreme Court decision casts doubt on the prior ruling." *Finkel v. Stratton Corp.,* 962 F.2d 169, 174–75 (2d Cir.1992).

thereof out of the company's delivery department.

After the jury returned a guilty verdict, the district court denied defendant's motion to set the verdict aside. Although expressing concern about the "boundless expansion of the misappropriation theory," the district court reluctantly declared that it was bound by this court's imposition of liability on virtually identical facts in *United States v. Libera*, 989 F.2d 596 (2d Cir. 1993). *Libera* dealt with the criminal liability of individuals who, like defendant here, received pre-release copies of the same "Inside Wall Street" column in *Business Week* magazine in violation of *Business Week*'s confidentiality policy and traded on the information. *See id.* at 598–99. In *Libera*, the information was passed to the defendants after it had been misappropriated by an employee of *Business Week*'s printer. *Id.*

Here, employees of entities further down the chain of distribution were the misappropriators. According to the evidence at trial, after being printed, *Business Week* magazine is sent to a national distributor of magazines, Curtis Circulation Company ("Curtis"). *See United States v. Falcone*, 97 F.Supp.2d 297, 299 (E.D.N.Y.2000). Curtis sells the magazine to various wholesalers, including Hudson News. Gregory Salvage, a 22–year employee of Hudson News, arranged for a subordinate to fax copies of the "Inside Wall Street" column—prior to the close of the stock market on Thursdays and prior to the public release of the magazine later that evening—to Smath, a stockbroker at Renaissance Securities and Salvage's neighbor. Smath himself traded based on this information and also passed it on to defendant, who likewise traded in reliance thereon.

On appeal, defendant argues that under the misappropriation theory as defined in

*O'Hagan*, it is not sufficient for the purposes of section 10(b) liability that a misappropriation ultimately results in securities trading. Instead, he argues, the misappropriation in breach of a duty must itself have a certain nexus with securities trading that is lacking in the scenario at issue in *Libera* and the instant case. Defendant further argues that even assuming *Libera* applies here, there was insufficient evidence to convict him of securities fraud or conspiracy to commit securities fraud. Although the first contention merits some discussion, we ultimately reject both arguments.

## DISCUSSION

### I.  *The Law of Insider Trading*

### A.  *Relevant Statutory Authority*

Section 10(b) of the Securities Exchange Act of 1934 is violated when: (1) "any manipulative or deceptive device" is used, (2) "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Pursuant to this section, the Securities and Exchange Commission has adopted Rule 10b–5, which provides in relevant part that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (b) To employ any device, scheme, or artifice to defraud, [or]
>
> · · ·
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection

with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

## B. *The Traditional Theory*

Under traditional insider trading theory, section 10(b) is violated when a corporate insider, such as an officer of the corporation, "trades in the securities of his corporation on the basis of material, non-public information." *O'Hagan,* 521 U.S. at 651–52, 117 S.Ct. 2199. Such trading constitutes deception under section 10(b) because "a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation," and this relationship gives rise to "a duty to disclose [or to abstain from trading] because of the necessity of preventing a corporate insider from ... tak[ing] unfair advantage of ... uninformed ... stockholders." *Id.* at 652, 117 S.Ct. 2199 (internal quotation marks omitted; alterations in original). Although the requirement that the deception be "in connection with" the purchase or sale of a security is not often discussed in traditional insider trading case law, the connection is almost self-evident: the duty of disclosure being breached is to persons with whom the insider is engaging in securities transactions, and the insider breaches that duty when he or she engages in the securities transaction without disclosure.

In *Dirks v. SEC,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), the Supreme Court held that under the traditional theory, it is equally a section 10(b) violation if, under certain circumstances, the corporate officer does not actually trade but instead "tips" a corporate outsider (*e.g.,* a friend or a family member) with the information for the purpose of having the outsider trade. *See id.* at 660, 103 S.Ct. 3255. In deciding *Dirks,* the first issue for the Supreme

Court was what duty of disclosure, if any, a corporate outsider was subject to, such that his or her trading in violation of that duty would constitute deception under section 10(b). The Court emphasized that there was no general duty of disclosure between all those who invest in the stock market, *id.* at 657–58, 103 S.Ct. 3255, and that, unlike corporate officers, corporate outsiders have no relationship with the corporation's shareholders from which any duty to disclose could arise, *id.* at 654–55, 103 S.Ct. 3255. While the Court ultimately determined that tippees could nevertheless still be in violation of section 10(b), it held that the circumstances under which that could occur were limited:

> [A] tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.

*Id.* at 660, 103 S.Ct. 3255.

The second issue for the Court in *Dirks* was to determine when an insider's duty was breached where the insider had not himself or herself traded based on material non-public information but had simply given outsiders such information. In *Dirks,* the corporate insider had given the defendant, an officer of a securities broker-dealer, information that a massive fraud was occurring at the corporation, in an attempt to expose that fraud. *Id.* at 667, 103 S.Ct. 3255. The defendant informed others of what he had been told and certain investors sold their securities in the corporation. *Id.* at 649 103 S.Ct. 3255. The question was whether the insider's actions constituted a breach of the insider's fiduciary duty to shareholders because, notwithstanding the insider's benign motives, trading in the corporation's secu-

rities without disclosure had still resulted from his provision of information to the defendant. The Court held that no such breach had occurred. *Id.* at 666–67, 103 S.Ct. 3255.

To constitute a violation of section 10(b), according to *Dirks,* "the test is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders. And absent a breach by the insider, there is no derivative breach." *Id.* at 662, 103 S.Ct. 3255. Thus, the tippee could not be held liable for a federal securities fraud violation simply because he or she in fact traded in securities or helped others to trade in securities based on the material nonpublic information. Rather, the key factor was the tipper's intent in providing the information.

## C. The Misappropriation Theory

### 1. The Theory In The Second Circuit

■ The Second Circuit was the first to recognize a different theory of insider trading: the misappropriation theory. *See generally United States v. Chestman,* 947 F.2d 551, 566–67 (2d Cir.1991) (*en banc*) (setting forth history of application of misappropriation theory in this Circuit). Under the misappropriation theory,

a person violates Rule 10b–5 when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction. In contrast to [the traditional theory], the misappropriation theory does not require that the buyer or seller of securities be defrauded. Focusing on the language "fraud or deceit upon *any* person" (emphasis added), we have held that the predicate act of fraud may be perpetrated on the source of the nonpublic information, even though the source may be unaffiliated with the buyer or seller of securities.

*Chestman,* 947 F.2d at 566.

Under this theory, this Court (prior to *Chestman*) upheld the securities fraud convictions of a newspaper reporter, a former newspaper clerk, and a stockbroker who traded securities based on misappropriated information similar to the type of information at issue in this case: "the timing and content of the *Wall Street Journal*'s confidential schedule of columns of acknowledged influence in the securities market." *United States v. Carpenter,* 791 F.2d 1024, 1027 (2d Cir.1986). While under the misappropriation theory, the duty that had been breached no longer was a duty owed to a party to a securities transaction, we found in *Carpenter* that such deception still satisfied the "in connection with" standard because

the use of the misappropriated information for the financial benefit of the defendants and to the financial detriment of those investors with whom appellants traded supports the conclusion that appellants' fraud was "in connection with" the purchase or sale of securities under section 10(b) and Rule 10b–5. We can deduce reasonably that those who purchased or sold securities without the misappropriated information would not have purchased or sold, at least at the transaction prices, had they had the benefit of that information. Certainly the protection of investors is the major purpose of section 10(b) and Rule 10b 5. Further, investors are endangered equally by fraud by non-inside misappropriators as by fraud by insiders.

*Id.* at 1032 (internal citations omitted). Rejecting the argument made by the *Carpenter* dissent that the "in connection with" requirement was not met because no

"securities-related" information had been misappropriated, we added that the deception was "in connection with" securities transactions because "the misappropriated information regarding the timing and content of certain *Journal* columns had 'no value whatsoever [to appellants] except "in connection with" their subsequent purchase[s] [and sales] of securities.'" *Id.* at 1033 (quoting *SEC v. Materia,* 745 F.2d 197, 203 (2d Cir.1984)). Furthermore, we pointed out that "[t]he 'sole purpose' of the scheme was to purchase and sell securities," *id.* (quoting *United States v. Newman,* 664 F.2d 12, 18 (2d Cir.1981)), "and thereby virtually to 'reap instant no-risk profits in the stock market,'" *id.* (quoting *Materia,* 745 F.2d at 203).[2]

We found ourselves applying the theory in the context of information obtained from a publication again in 1993 in *United States v. Libera,* 989 F.2d 596 (2d Cir. 1993). *Libera* involved the same magazine at issue in this case—*Business Week*—and a similar scheme involving the pre-release misappropriation of the "Inside Wall Street" column. *Id.* at 598–99. However, unlike in *Carpenter,* in *Libera,* the misappropriators of the information did not trade—or have others trade on their behalf—based on the misappropriated information. *Id.* The initial misappropriator in *Libera,* in fact, did not receive any financial payment at all for advance copies of the column; eventually, when that individual was unable to continue, his replacement was paid $20 and later $30 per column. *Id.*

The main issue in *Libera* was whether, in order to find the tippees liable under Section 10(b) pursuant to the misappropriation theory, "the tipper must have known that his breach of a fiduciary obligation would lead to the tippee's trading on the misappropriated information." *Id.* at 597. Under the traditional theory of insider trading, tippee liability was in fact premised on the intent of the tipper to provide the tippee with information that the tippee could use to make money in securities trading. *See Dirks,* 463 U.S. at 664, 103 S.Ct. 3255 (holding that tippees and tippers would be liable where there existed a "relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the particular recipient. The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend.") *Libera* held, however, that tippee liability under the misappropriation theory did not require this type of knowledge by the tipper, and that

> [t]he tipper's knowledge that he or she was breaching a duty to the owner of confidential information suffices to establish the tipper's expectation that the breach will lead to some kind of a misuse of the information. This is so because it may be presumed that the tippee's interest in the information is, in contemporary jargon, not for nothing. To allow a tippee to escape liability solely because the government cannot prove

2. On appeal, the Supreme Court-missing one justice-split 4–4 on the question of the validity of the securities fraud convictions, thus affirming the judgment of the court below. *See Carpenter v. United States,* 484 U.S. 19, 24, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (observing in its recitation of the facts that "[a]lthough the victim of the fraud, the *Journal,* was not a buyer or seller of the stocks traded in or otherwise a market participant, the fraud was nevertheless considered [by the lower courts] to be 'in connection with' a purchase or sale of securities within the meaning of the statute and the rule," but ultimately holding that the court was "evenly divided with respect to the convictions under the securities laws and for that reason affirms the judgment below").

to a jury's satisfaction that the tipper knew exactly what misuse would result from the tipper's wrongdoing would not fulfill the purpose of the misappropriation theory, which is to protect property rights in information.

*Libera,* 989 F.2d at 600.

■ Thus, *Libera* held that the only required elements for tippee liability were: "(i) a breach by the tipper of a duty owed to the owner of the nonpublic information; and (ii) the tippee's knowledge that the tipper had breached the duty." *Id.* at 600. Other than in its recitation of the standard set forth in Rule 10b–5, *Libera* made no mention of the "in connection with" requirement.

### 2. *The Supreme Court's Decision In O'Hagan*

In *O'Hagan,* the Supreme Court resolved an inter-circuit conflict regarding the validity of the misappropriation theory and held that a lawyer who traded in the shares of the target company of a proposed acquisition based on information misappropriated from his law firm and its client, the company seeking to acquire the target, violated section 10(b). *O'Hagan,* 521 U.S. at 653, 117 S.Ct. 2199. The Court agreed that section 10(b)'s deception requirement could be predicated on a fraud on the source of confidential information instead of a buyer or seller of securities, but it did not fully endorse the broad rationale this Circuit provided in *Carpenter* for why the deception of a source of confidential information was "in connection with" the purchase or sale of a security.

As defined by the Supreme Court in *O'Hagan,* the misappropriation theory holds that a section 10(b) violation occurs when an individual "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *Id.* at 652, 117 S.Ct. 2199. Under *O'Hagan,* the "deception" requirement of section 10(b) is satisfied by the misappropriator's "feigning fidelity to the source of [the confidential] information." *Id.* at 655, 117 S.Ct. 2199. According to the Court, "[a] company's confidential information ... qualifies as property to which the company has a right of exclusive use" and "[t]he undisclosed misappropriation of such information, in violation of a fiduciary duty ... constitutes fraud akin to embezzlement-the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another." *Id.* at 654, 117 S.Ct. 2199 (internal quotation marks and citations omitted). Because the lawyer O'Hagan had breached the fiduciary duty he owed both to his law firm and to the firm's client to keep their information confidential and not appropriate such information to his own use, he had engaged in deception within the meaning of section 10(b).[3]

The Court held that section 10(b)'s requirement that the deception be "in connection with the purchase or sale of any security" was satisfied because "the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities. The securities transaction and the breach of duty thus

---

**3.** The Court justified this finding in part by observing that "[a]lthough informational disparity is inevitable in the securities markets, investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law." *Id.* at 658, 117 S.Ct. 2199. Because the deception under the misappro-

priation theory is "feigning fidelity" to the source of the information, however, the Court held that notwithstanding the damaging effects of unequal information, if the fiduciary discloses to the information source his or her intent to trade based on the information, there is no fraud constituting a violation of section 10(b). *Id.* at 655, 117 S.Ct. 2199.

coincide." *Id.* at 656, 117 S.Ct. 2199. That is, O'Hagan legitimately possessed the information given his fiduciary relationship with the source of the information, and the "misappropriation" occurred only when he used that information to trade securities.

The Court distinguished, as not satisfying the "in connection with" requirement, a scenario in which an employee embezzles money from his or her employer for the purpose of buying securities. The Court did so on the ground that "money can buy, if not anything, then at least many things; its misappropriation may thus be viewed as sufficiently detached from a subsequent securities transaction that § 10(b)'s 'in connection with' requirement would not be met." *Id.* at 656–57, 117 S.Ct. 2199. In contrast, the Court stated, the information targeted by the misappropriation theory is information of the sort that "misappropriators ordinarily capitalize upon to gain norisk profits through the purchase or sale of securities," *id.* at 656, 117 S.Ct. 2199 *i.e.,* information that "ordinarily" "derives its value ... from its utility in securities trading." *Id.* at 657, 117 S.Ct. 2199. The misappropriation of such information thus possesses a sufficient connection to securities trading to satisfy section 10(b) and Rule 10b–5.

## II. *Application In This Case*

### A. *Do Libera and Carpenter Still Provide The Governing Rule After O'Hagan?*

█ While, as the district court in the instant case pointed out, the coincidence of a securities transaction and breach of duty-identified in *O'Hagan* as contributing to the satisfaction of the "in connection with" requirement-is not present where, as here, the misappropriator tips the information to an outsider but does not trade or have others trade on his or her behalf,[4] the Supreme Court in *O'Hagan* did not purport to set forth the sole combination of factors necessary to establish the requisite connection in all contexts. Accordingly, this Circuit after *O'Hagan* has applied the misappropriation theory to schemes involving nontrading tippers, albeit without discussion of the "in connection with" requirement. *See United States v. McDermott,* 245 F.3d 133 (2d Cir.2001) (applying theory to hold that sufficient evidence supported insider trading conviction of nontrading tipper—the president, CEO and chairman of an investment bank specializing in mergers and acquisitions-who gave material, non-public information for trading purposes to a woman with whom he was having an affair). Application of *Libera* to the instant case is therefore not undermined by the lack of a trading tipper here, notwithstanding the intervening decision in *O'Hagan.*

*O'Hagan*'s requirement that the misappropriated information "ordinarily" be valuable due to "its utility in securities trading," *O'Hagan,* 521 U.S. at 657, 117 S.Ct. 2199, appears to be a more generally applicable factor in determining whether section 10(b)'s "in connection with" requirement is satisfied. That requirement

---

**4.** As the *O'Hagan* dissent pointed out, if O'Hagan simply tipped someone else the information, "[t]he mere act of passing the information along [to the tippee] would have violated O'Hagan's fiduciary duty and, if undisclosed, would be an 'embezzlement' of the confidential information, regardless of whether the tippee later traded on the information." *O'Hagan,* 521 U.S. at 686 n. 2, 117 S.Ct. 2199 (Thomas, J., dissenting). Even if the tippee did trade, moreover, the tipper's breach of duty and the securities transaction would not coincide. The breach of the tipper's duty to the information source occurs at the exchange of information to which the source has a right of exclusive use, not upon the use of the information by the tippee for a securities transaction.

is met in a case where, as here, the misappropriated information is a magazine column that has a known effect on the prices of the securities of the companies it discusses. *See Carpenter*, 791 F.2d at 1033 (holding that "the misappropriated information regarding the timing and content of certain *Journal* columns had no value whatsoever to appellants except in connection with their subsequent purchases and sales of securities") (internal quotation marks and brackets omitted).[5]

*Libera*, therefore, continues to provide the relevant criteria by which to evaluate defendant's conviction.

### B. Breach of Duty and Tippee's Knowledge Under Libera

■ To support a conviction of the tippee defendant, the government was simply required to prove a breach by Salvage, the tipper, of a duty owed to the owner of the misappropriated information, and defendant's knowledge that the tipper had breached the duty. *See Libera*, 989 F.2d at 600. Defendant argues that this case differs factually from *Libera* because no fiduciary duty existed here and, even if it did, he did not know that the information

he was receiving from Salvage had been obtained in violation of that duty. We disagree.

Defendant claims that while the confidentiality of the "Inside Wall Street" column may have been clearly communicated to *Business Week*'s printer under the facts of *Libera*, with corresponding acceptance by the printer of the responsibility to maintain the confidentiality of that information to protect *Business Week*'s interests, such confidentiality was not made sufficiently clear here to those further down the distribution chain-such as Hudson News. Thus, he claims, there was no fiduciary duty to be breached. It is true that this Circuit has held that "a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information," *Chestman*, 947 F.2d at 567, and that a fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties. *Id.* at 567–68. Qualifying relationships are marked by the fact that the party in whom confidence is reposed has entered into a relationship in which he or she acts to

---

5. While the Supreme Court in *O'Hagan*, in the course of reviewing prior decisions in which it had not reached the misappropriation theory question, cited approvingly to a law review article which referred to the misappropriation from a publication in *Carpenter* as constituting an " 'unusual case' " because "the information there misappropriated belonged not to a company preparing to engage in securities transactions, *e.g.*, a bidder in a corporate acquisition, but to the *Wall* Street Journal," *O'Hagan*, 521 U.S. at 650 n. 4, 117 S.Ct. 2199 (quoting Barbara Bader Aldave, *The Misappropriation Theory: Carpenter and its Aftermath*, 49 Ohio St. L.J. 373, 375 (1988)), it made no comment regarding the extent, if any, that that unusual element affected whether the misappropriation was "in connection with" a purchase or sale of a security.

We do observe, however, that while the *O'Hagan* majority's response to Justice Thomas's criticism of the "ordinarily" standard was to note his "evident struggle to invent other uses to which O'Hagan plausibly might have put the nonpublic information," *O'Hagan*, 521 U.S. at 657 n. 8, 117 S.Ct. 2199 the struggle is not necessarily as difficult in a case in which the information is misappropriated from a publication. In this case, for example, Hudson News employee Salvage began violating company policy in late 1994 by taking copies of golf magazines and *Playboy* magazines and giving them to his neighbor Smath, and Smath appears to have initially added a request for financial magazines simply because he was in the process of learning to be a stockbroker.

serve the interests of the party entrusting him or her with such information. *Id.* at 568–69.

Sufficient evidence was introduced at trial, however, from which a reasonable jury could find that these elements were present here. The evidence indicated that periodically *Business Week* would ask Curtis, the distributor, to issue "a policy statement to the wholesalers requesting that *Business Week* not be distributed before 5:00 p.m. on Thursday afternoon." Curtis understood and communicated to Hudson News that this policy was needed because there was highly confidential information in the "Inside Wall Street" column that *"Business Week* had agreed not to make known to the general public before 5 p.m. on Thursday." A representative from Hudson News testified that Hudson News employees understood that *Business Week* "like[d] to make sure that the information in that magazine is held very closely," that Hudson had a "unique deal" to carry out that purpose, and that the magazines were "a product entrusted to Hudson News that didn't belong to us. It belonged to the publisher. They entrusted it to us." Hudson had a policy prohibiting the theft of copies of the magazine or the removal of the magazine or articles therein from the premises, and Curtis at one point actually sent representatives to check that this policy was being enforced. *Falcone,* 97 F.Supp.2d at 299–300. Finally, a representative from Hudson News testified that the misappropriator Salvage, in fact, was the "top person in the delivery room area" and therefore was not only informed of such policies and rules but was responsible for enforcing them.

Defendant also claims that he did not know the source of the information he received from Smath. However, as the district court noted, Smath testified that in fact he told defendant the details of the scheme. In addition, Smath testified that defendant paid him $200 for each column, substantially in excess of the magazine's sale price. *See Falcone,* 97 F.Supp.2d at 300. The jury could therefore believe Smath rather than defendant in finding that defendant knew he was obtaining stolen information.

## CONCLUSION

For the reasons set forth above, we affirm defendant's convictions.